# DONALD PRINCE AND ANOTHER v. EARL N. SONNESYN AND OTHERS.[1]

December 6, 1946.

No. 34,220.

[1]Reported in 25 N. W. (2d) 468.

*Louis B. Schwartz* and *Samuel P. Halpern,* for appellant.

*Stanley V. Shanedling,* for respondents.

MAGNEY, JUSTICE.

Plaintiffs, Donald Prince and Gordon Jensen, and defendant Earl N. Sonnesyn were members of a partnership at will known as the Prince Manufacturing Company. Each had a one-third interest. On June 12, 1944, a corporation by the same name was organized to succeed to the partnership. Sonnesyn acquired a controlling interest in the corporation. Plaintiffs, claiming that Sonnesyn fraudulently induced them to agree to incorporate and fraudulently acquired a controlling interest, brought action. They prevailed, and Sonnesyn appeals from an order denying his motion for a new trial.

Plaintiff Prince had operated a small manufacturing plant under the name of the Prince Manufacturing Company. He desired to secure war contracts. The Smaller War Plants Corporation directed him to Sonnesyn, who as an individual operated under the name of Twin City Engineering Service, Inc. On October 19, 1943, Prince and Sonnesyn formed a partnership, and on December 1, 1943, they commenced business as such partnership under the same name. The agreement was in writing. Prince was to draw $100 a week, and Sonnesyn was to receive five percent of the gross production of the shop plus actual traveling expenses. They agreed that as soon as the shop was on a paying basis and any surplus was not needed there would be a division of profits on a "50-50 basis." Prince was to have full charge of the shop, and Sonnesyn was to obtain contracts. Sonnesyn secured the first contract on or about January 1, 1944. It was with the Bendix Company. Three thousand dollars was raised as operating capital on a note given to one Ralph Arone, signed by the parties and secured by a chattel mortgage on the equipment of the shop and Sonnesyn's

interest in his homestead. To obtain this money, another note for $1,000 was given Arone as a bonus. Later it was discovered that the personal property covered by the chattel mortgage was, as to a large part of it, not owned by Prince and that he personally was owing about $1,121.35 for labor, rent, and other items on his prior activities. Sonnesyn arranged additional financing with the First Acceptance Corporation of Minneapolis, which also at the outset loaned them $1,000 on paper sold to it.

On or about February 1, 1944, the plaintiff Gordon Jensen was taken in as a partner. He contributed machine-shop tools. The three were to share the profits equally. Each was to draw $100 a week. Nothing was then said about Sonnesyn receiving five percent of production. Prince was to be in charge of production, Jensen was to design and build or supervise the building of certain tools, and Sonnesyn was to handle the finances. Under this new arrangement the partnership continued to operate, and successfully so. In the early part of May 1944, Sonnesyn made a proposition to incorporate the business. The partnership then owed the First Acceptance Corporation $36,000. It had purchased a number of accounts on actual invoices, for which, if not paid, the parties would be liable. This was the nature of the indebtedness. On May 1, 1944, the net worth of the partnership was $11,555.18, and up to that time the three partners had drawn out of the business a total of $6,837.35, which included Prince's prior indebtedness. From these figures it is apparent that the business had prospered. Sonnesyn gave as his reason for wanting to incorporate that the First Acceptance Corporation was worried about its money, that he felt insecure, and that Prince and Jensen could not back up $36,000. He said that he could protect them, and, as Prince testified, "for the $36,000 by virtue of the fact that he was a friend of the company and personally endorsed any debt that we owed them, and that he mortgaged his house to them to secure this money and so to protect himself and the First Acceptance Company, it was necessary that he get 51 percent of the stock * * * or 52 percent." Sonnesyn said that the company could no longer run the way it had

in the past because of the fact that he was personally liable for all the accounts that were due the First Acceptance Corporation. He also said that he had to have a controlling interest in the corporation in order to continue, because the First Acceptance Corporation had told him that unless he controlled the stock they would have to discontinue the discount banking of the company. He said that he was a personal friend of the officers or some officer of the First Acceptance Corporation and that because of that friendship he was able to secure the money that was used to transact the business; that without him, his taking care of the finances, they could not exist. We are giving the version of the testimony most favorable to plaintiffs, as we must.

Prince and Jensen objected to giving a controlling interest to Sonnesyn, as they felt that he was not entitled to more than a third, the same as under partnership basis. Sonnesyn then gave Prince and Jensen four alternatives: That they incorporate, sell, buy, or dissolve the partnership and go out of business. He said, "If you don't like it, you can pull out." Sonnesyn offered Prince $2,000 for his interest, but did not indicate what he would take for his own. Prince did not want to sell. The earnings of the partnership during the short time of operation, as has been shown, clearly indicate why Prince and Jensen did not want to sell or liquidate. They were doing well, but at that time they undoubtedly lacked the means with which to buy Sonnesyn's interest. So, believing the representations made by Sonnesyn and wanting to stay in business, they agreed to incorporate and give Sonnesyn control of the corporation.

Sonnesyn admits that he told Prince and Jensen that he did not want to be a minority stockholder; that the business had become complicated and the liabilities large and that if they would agree to incorporate he would waive his five percent of production. When Jensen entered the partnership nothing was said about five percent of production. Sonnesyn admits that he gave Prince and Jensen the four-way proposition already mentioned and that he offered to buy Prince's interest. That Sonnesyn's purpose in insisting that

the partnership be incorporated was not solely for his own financial protection, as he claims, is evidenced by the fact that after incorporation, when he had secured control of the business, his salary was boosted to $200, while the salary of Prince and Jensen was fixed at $125 a week for each.

On May 19, 1944, the parties agreed in writing to create a corporation for the continuance of the business and to have issued to Sonnesyn 59 shares and to plaintiffs 28 shares each, or 56 shares. Jensen was to contribute certain machinery to the corporation, for which 12 shares were to be issued to Sonnesyn and six shares each to plaintiffs. It was further agreed that the proposed corporation should assume the $4,000 liability to Arone. The articles of incorporation were signed on June 12, 1944. The business was incorporated on Sonnesyn's terms and on conditions laid down by him.

Shortly after incorporation, a contract for $600,000 for the manufacture of 50,000 rocket nozzles for the National Tube Company was received. The filling of this order enlarged tremendously the activities of the business and greatly increased the need for operating capital.

Originally, the First Acceptance Corporation loaned the Prince Manufacturing Company $1,000. The loan was not made to Sonnesyn personally. It continued to purchase a number of accounts on actual invoices, but no personal security or mortgage was given by Sonnesyn. The officers of the First Acceptance Corporation were not personal friends of Sonnesyn, and at no time did they say to Sonnesyn that the partnership should incorporate and give control to Sonnesyn or they would not loan the members of it any money. At the time of the first transaction they investigated Sonnesyn personally and the Prince Manufacturing Company as a name. If purchase orders were not paid, the indebtedness would become due immediately and the partners personally liable for payment. Sonnesyn signed not as an individual, but for the partnership.

In January 1945, plaintiffs asked Sonnesyn to resign as officer and director and turn over to them his stock to be used with theirs as collateral in negotiating a loan. He complied on January 12, 1945. They were unable to secure the loan. The corporation was deeply indebted, and plaintiffs gave written consent to the appointment of a receiver. Defendant Charles C. Arnao was appointed as such receiver. Prince and Jensen were employed by the receiver, who continued to operate the business. Finally, on August 7, 1945, he sold all the assets of the corporation. The stock was returned to Sonnesyn on January 29.

From January 31, 1945, until July 31, 1945, the receiver did business to the extent of $278,483, and after selling the assets of the corporation on August 7, 1945, and after paying all taxes, all creditors, and all receivership expenses, he was in possession of about $18,000. The present litigation in effect involves the distribution of that sum.

The trial court found as facts that Sonnesyn suggested that the partnership be incorporated and that he be issued 52 percent of the stock as against plaintiffs' 48 percent; that "as a basis for and in order to secure such control [he] represented to plaintiffs that he had been able to secure financing from the First Acceptance Corporation only because he was a particular friend of the officers of said finance company and was therefore able to get loans because of such friendship; that he was personally liable on the assignments of the contracts to the finance company; and that the said finance corporation insisted that a corporation be formed and that he, Sonnesyn, control the corporation." The court found that the representations were fraudulent and false; that with knowledge of their falsity they were made with intent to deceive and defraud plaintiffs; and that plaintiffs were ignorant of the falsity of the representations and believed and acted on the same.

On this appeal we find 34 assignments of error covering 14 printed pages of appellant's brief. Of course it is not practical to consider each one separately, nor does each one merit separate consideration.

The question which first arises is whether there is evidence to support the findings of the court that plaintiffs were induced by fraudulent representations made by Sonnesyn to agree to convert their three-way equal partnership into a corporation in which Sonnesyn would own 52 percent of the stock and each plaintiff only 24 percent. There must have been some compelling reason why plaintiffs became willing to give Sonnesyn an interest in the business greater than what they together would own, as the trial court suggested. Sonnesyn had invested only his credit in the partnership. An examination of the testimony supports the finding of the court that Sonnesyn falsely represented to plaintiffs that he had been able to secure financing from the First Acceptance Corporation because he was a personal friend of the officers of that company. As a matter of fact, Sonnesyn had never met the officers of the company until just prior to its purchase of the first purchase order. They never saw or knew him until he walked into their office to discuss the financing of the partnership business. The evidence also supports the finding that Sonnesyn represented to plaintiffs that he was personally liable on the assignments of the contracts to the finance company. Of course all the members of the partnership were personally liable on the paper they sold as partners in case there should be a default. Plaintiffs knew this. Jensen testified that "he said he had signed each of these assignments, or whatever they were, and was personally liable," and Prince testified that he believed Sonnesyn had "personally endorsed any money that they [the First Acceptance Corporation] loaned" to the partnership. The evidence also supports the finding that Sonnesyn represented to plaintiffs that the finance company insisted that a corporation be formed and that he, Sonnesyn, should control the corporation. Jensen testified that Sonnesyn stated to him and Prince that he would have to have controlling interest in the corporation in order to continue in business, "because the First Acceptance Corporation, with which we had a considerable loan, or [which] we had sold our paper to, told him [Sonnesyn] that unless he controlled the stock of the Prince Manufacturing Com-

pany they would have to discontinue discount banking of our company." Prince testified that Sonnesyn told them "that the First Acceptance [Corporation] felt that our company should incorporate in order to protect their $36,000, and that unless he [Sonnesyn] was in charge of this company and unless he was made the president of the company they would not loan us any money." An officer of the finance company denied that any such statement was made to Sonnesyn.

Plaintiffs are mechanics. They are inexperienced in business. They admit it, and the record bears them out. They believed Sonnesyn's representations and agreed to incorporate and give him a majority of the stock. Prince testified that he considered that his consent to the incorporation and division of the stock was his "only alternative," and Jensen said: "We went ahead and incorporated because it was told to us that unless Mr. Sonnesyn had control of the company, and he couldn't do it as a partnership, why, our funds would not be available to operate, and that he had to be the head of a corporation."

■ Plaintiffs and Sonnesyn were partners. Because of this, the relation between them was fiduciary. The law imposes the highest standard of integrity. It is the duty of partners to observe the utmost good faith toward one another in all their transactions. 5 Dunnell, Dig. & Supp. § 7374, and cases cited. 40 Am. Jur., Partnership, § 113, expresses the duty of one partner to another as follows:

"The relations between partners is essentially one of mutual trust and confidence, and the law imposes upon them highest standards of integrity and good faith in their dealings with each other."

Measured by that yardstick, Sonnesyn fell short.

■ The evidence reasonably sustains the findings of the trial court. Such findings, where reasonably sustained by the evidence, will not be disturbed here. 1 Dunnell, Dig. & Supp. § 411. In one of our late cases (Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. [2d] 362, 363), we said:

"Conflicts in evidence are not to be resolved on appeal, and the trial court's findings will not be disturbed unless they are manifestly and palpably contrary to the evidence."

■ Sonnesyn claims that plaintiffs here are claiming the benefits of the contract for the forming of the corporation and at the same time rescinding it, which cannot be done. In this case, the parties entered into a written agreement covering the conversion of their partnership into a corporation. It was Sonnesyn's proposal that was incorporated into the agreement and carried out by means of the incorporation. The only purpose of the incorporation was to satisfy his desire to acquire control of the corporation. He said he would not go ahead with the incorporation unless he secured control of the stock. The court found that the contract for the formation of the corporation and the division of the stock was an entire agreement and part of one transaction. The court set aside the formation of the corporation and the issuance of the stock as between plaintiffs and Sonnesyn, but held that the rights of creditors and the receiver should not be affected by the judgment. Thus, there was not a partial rescission as between plaintiffs and Sonnesyn, but a rescission of their entire agreement to incorporate and distribute the stock as between themselves.

The rule is stated in 12 Am. Jur., Contracts, § 444:

"As a general rule the right to rescind must be exercised in toto. The contract must stand in all its provisions or fall altogether. Accordingly, a party cannot repudiate a contract or compromise so far as its terms are unfavorable to him and claim the benefit of the residue. A partial rescission, however, may be allowed where the contract is a divisible one."

Here, there was not a partial rescission. As between the parties, the court set aside everything pertaining to the agreement to incorporate, the incorporation, and the distribution of the stock. The court held that the fund to be distributed by the receiver be distributed to plaintiffs and Sonnesyn on the basis that they were equal partners and entitled to share equally in the proceeds; that

the fund be considered as a liquidated partnership fund; "that this involves a partnership accounting, taking into consideration the withdrawals that each partner has made, not only before but after the formation of the corporation, and before the appointment of the receiver, and then after equalizing such withdrawals to divide the balance upon the basis that plaintiffs and the defendant [Sonnesyn] are equal partners." The court retained jurisdiction for accounting purposes.

In their complaint plaintiffs asked the court to require Sonnesyn to surrender for cancellation the 24 2/3 shares of stock in the corporation and that it be reissued to plaintiffs share and share alike. In addition, plaintiffs asked for "such other and further relief as is just and equitable in the premises." The court did not grant the specific relief asked for, but rescinded the whole transaction, which, on the facts pleaded and the evidence produced, it had a right to do under the prayer for general relief.

In 3 Dunnell, Dig. § 5041, the rule is stated:

"* * * A plaintiff cannot be thrown out of court because he has mistaken the character of his cause of action and remedial right, but only when he has failed to show himself entitled to any relief on the facts proved within the allegations of his complaint. The court, disregarding plaintiff's theory of the case and prayer for relief, should consider the facts proved within the allegations of the complaint, in connection with the whole body of the substantive and remedial law of the state, and grant relief accordingly—either legal or equitable, * * *."

In Colby v. Street, 168 Minn. 57, 61, 209 N. W. 537, 539, this court stated:

"* * * A prayer for general relief is as broad as the equitable powers of the court."

In Hoffman Motor Truck Co. v. Erickson, 124 Minn. 279, 281, 144 N. W. 952, 953, it is stated:

"* * * Plaintiff must be awarded such relief, either legal or equitable, as the facts proved required, regardless of the prayer.

* * * And in equity the kinds and forms of specific remedies are as unlimited as the powers of such courts to shape relief awarded in accordance with the circumstances of the particular case. 1 Pomeroy, Eq. Jur. (2nd ed.) § 170."

In Magee v. Odden, 220 Minn. 498, 502, 20 N. W. (2d) 87, 89, this court said:

"The rule to be applied in view of the recited facts is that, since fraud renders voidable everything into which it enters, the court will look through any form of instrument or proceeding in order to prevent a party from profiting by his fraud; that the court will not take a single step to save harmless the party who is guilty of fraud; and that no right can arise out of a fraudulent act."

This is an equitable action, and the disposition by the court upon the facts as it found them seems realistic and equitable. It is true that the relief granted by the court is not the relief asked by plaintiffs, but—

"A court of equity will mould its relief so as to determine the rights of all the parties, and it will not allow the pleadings to prevent it from getting at the heart of the controversy and seeing that a right result is reached. In equity the kinds and forms of specific remedies are as unlimited as the powers of such courts to shape relief awarded in accordance with the circumstances of the particular case." 2 Dunnell, Dig. § 3138.

In Beliveau v. Beliveau, 217 Minn. 235, 245, 14 N. W. (2d) 360, 366, we stated:

"* * * A court of equity has the power to adapt its decree to the exigencies of each particular case so as to accomplish justice. It is traditional and characteristic of equity that it possesses the flexibility and expansiveness to invent new remedies or modify old ones to meet the requirements of every case and to satisfy the needs of a progressive social condition."

There is no good reason, as the trial court saw it, why the formation of the corporation should be set aside except as between

the parties, and as between them there was a complete rescission. The court shaped the decree to conform to the circumstances with which it was confronted.

■ Plaintiffs discovered the fraud on January 11, 1945. They brought their action the following July. Sonnesyn claims that because of this delay plaintiffs are guilty of laches. In Peterson v. Schober, 192 Minn. 315, 327, 256 N. W. 308, 314, this court stated:

"Delay does not constitute laches unless it is culpable under the circumstances. * * * The practical question in each case is whether there has been such unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief sought."

Shortly after plaintiffs discovered the fraud the corporation went into the hands of a receiver, and the receiver continued to operate the business until after this action was brought. Thus the delay could not have affected Sonnesyn one way or another. Neither did he change his position during this period. See, Johns v. McGenty, 222 Minn. 84, 23 N. W. (2d) 289, and Knox v. Knox, 222 Minn. 477, 25 N. W. (2d) 225, where we stated the general rule as to waiver of fraud by unreasonable delay in rescinding a contract after learning of deception. The delay here is not of such a character as to constitute laches.

Order affirmed.