FRANK'S LIVESTOCK & POULTRY
FARM, INC., Appellant,

v.

CITY OF WELLS, et al., State of
Minnesota, et al., Respondents.

No. C5–88–1078.

Court of Appeals of Minnesota.

Nov. 22, 1988.
Review Denied Jan. 25, 1989.

Michael A. Pinotti, Roseville, for Frank's Livestock & Poultry Farm, Inc.

Jon K. Iverson, Minneapolis, for City of Wells, et al.

Hubert H. Humphrey, III, Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, for State of Minn., et al.

Thomas L. Grundhoefer, St. Paul, for amicus, League of Minnesota Cities.

Heard, considered and decided by LANSING, P.J., and KALITOWSKI and IRVINE,* JJ.

## OPINION

LANSING, Judge.

Frank's Livestock & Poultry Farm, Inc. seeks recovery against the City of Wells, its individual agents, and the State of Minnesota and its deputy fire marshal for fire damage to corn and a corn storage building. The trial court granted summary judgment denying the claim and Frank's Livestock & Poultry Farm appeals.

## FACTS

In the early morning hours of November 20, 1986 a fire broke out in a corn storage building on Frank's Livestock Farm just outside the city limits of Wells, Minnesota. A neighbor, Duane Johnson, drove by the farm between 6:10 to 6:30 a.m., and saw the entire outline of the building completely engulfed in flames. As he got closer he saw the flames shooting through holes in the roof, but the walls of the building were standing and the roof was still intact. Johnson saw flashing lights behind the shed which he initially assumed to be the fire department, but later concluded were arcing electrical wires or a metal reflection. Johnson continued into Wells where he told a Wells police officer, Gary Robbins, about the fire.

Robbins drove out to Frank's Livestock Farm and observed the fire from the road. He said only the south wall remained. On his way back to Wells he contacted the Faribault Sheriff's department dispatcher to request they call the Frank residence. He also called Captain Milt Peterson of the Wells Fire Department and told Peterson he thought the building was totally down.

After returning to Wells, Robbins picked up Peterson and took him directly back to Frank's Livestock Farm, arriving at about 6:20 a.m. Peterson went up to the building to check the arcing wires while Robbins pounded on the door of the Frank's house. Robbins received no response at the house and he and Peterson went back to Wells to contact the Rural Electric Association about the live wires.

Karen Frank did not hear knocking and did not know about the fire until she awoke at 6:30 a.m. and smelled smoke. She saw the whole building engulfed in flames which were shooting five to six feet above the roof. She called the Wells fire line at 6:35 a.m. to report the fire. Peterson immediately reported to the fire station to answer the call. The Wells fire department is a volunteer department, with only gear and equipment supplied by the City of Wells.

When Peterson got to the station he spoke with assistant fire chief Terry Whalen. They decided that since the building was down they would send only one fire truck and call if more were needed. The Wells fire department customarily responds to a fire call with three trucks. Peterson, in his fire gear, accompanied by firefighters John Sonnek and Mike Schultz, returned to Frank's Livestock Farm, arriving at about 6:50 a.m. At the farm Sonnek told Peterson that the building contained corn.

The firefighters' evaluations of the fire and the condition of the storage building were similar. Peterson said there was hardly any building left and the roof was resting on top of the corn. No flames were immediately apparent, but Peterson observed a six to eight inch burned crust on the corn which flamed up when broken. He thought that because water would run off the roof it would do no good to pump water on the fire.

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Schultz said the fire was contained by the collapsed roof. He thought the south part of the building was intact and that the corn was not in flames except at the north end. He also believed it would do no good to pump water on the building.

Sonnek said part of the north wall and possibly parts of other walls were standing. He estimated the crust on the corn to be approximately ten inches deep and told Frank that spraying water on the roof would not extinguish the fire below.

Peterson called Deputy State Fire Marshal Jerald White on his fire truck radio through the Wells police station phone connection. After listening to Peterson's description, White said they could either let the fire burn out or get heavy construction equipment and put the fire out as they removed parts of the building. They decided to let the fire burn out because they did not have the heavy equipment needed.

Peterson told Frank of their decision and said she acknowledged there was nothing more the fire department could do. Frank stated in her deposition that she listened while Peterson talked to White and understood that she could get heavy equipment to remove the tin roof and put the fire out.

Peterson and the rest of the firefighters left the farm at about 7:00 a.m. and went back to Wells. Shortly before 9:30 a.m. Schultz called the Franks' residence and learned that Gene Webber, a heavy equipment operator, was on his way to the farm to dismantle the building. Schultz and Whalen drove to the farm and, after talking to Webber, returned to the station to get the necessary equipment to extinguish flare-ups during the dismantling. They returned with other firefighters about 10:00 a.m., and set up their portable tank, pumper, and hoses.

The firefighters saw small fires where timbers were burning, but the crust was snuffing the fire out. Frank testified that when Webber began dismantling the building, the 12–inch top layer of corn was burned and the top 18 inches was removed. The firefighters began pumping water on the flare-ups at about 10:35 a.m. and finished at about 4:00 p.m.

John Frank was in Wyoming at the time of the fire. He testified that there were approximately 34,000 bushels of corn with a value of $70,000 stored in the building. He sold half of the corn after the fire, but it is unclear what happened to the remaining corn. He estimated the damage to the building at $80,000, but in his deposition stated that the firefighters' actions did not cause the building's damage.

The trial court granted respondents' motions for summary judgment without supporting memorandum. Frank's Livestock appeals arguing that summary judgment was improper because governmental immunity does not apply, that the City of Wells waived any claimed discretionary immunity by obtaining insurance, and that awarding costs and disbursements to respondents was an abuse of the trial court's discretion.

## ISSUES

1. Did a deputy fire marshal's telephone conversation with firefighters at the scene of the fire constitute physical interference under Minn.Stat. § 609.60(2) (1986) and provide a basis for a civil cause of action against the deputy and the state?

2. Does the official immunity doctrine protect a police officer and volunteer firefighter from individual liability for their alleged negligence?

3. Did the municipality and its units have a duty to the owner of the corn storage building to minimize the damage to the corn by employing a private heavy equipment contractor?

4. Was the trial court's award of costs and disbursements an abuse of discretion?

## ANALYSIS

Frank's Livestock alleges as its theory of recovery that the City of Wells, through its police officer and firefighters, and the State of Minnesota, through its deputy fire marshal, were liable in negligence for acts and omissions at the time of the fire. The complaint also names as individual defendants deputy state fire marshal Jerald White, Wells police officer Gary Robbins,

and volunteer fire captain Milton Peterson. Firefighters John Sonnek and Michael Schultz, originally named in the complaint, have been dismissed by stipulation.

It is not clear from the pleadings which acts or omissions form the basis for the negligence claims. Frank's Livestock states in its briefs that the basis for respondents' liability is the arrival of a police officer and firefighters at three separate times on the morning of the fire, twice without adequate equipment, and leaving without extinguishing the fire. Because different doctrines of governmental and individual immunity apply to the liability issues, we address the categories separately.

## I. *Alleged Negligence of Jerald White and the State of Minnesota*

The claims against White and the State of Minnesota stem from White's telephone conversation with Peterson. Frank's Livestock asserts that White's advice on how to extinguish the fire violated Minn. Stat. § 609.60(2) (1986), which provides that anyone who intentionally "[i]nterferes with or obstructs the prevention or extinguishing of any fire * * *" is guilty of a misdemeanor. The violation, according to this argument, creates a basis for civil liability.

A parallel statute, Minn.Stat. § 609.50 (1986), provides that anyone who intentionally interferes with a peace officer performing official duties may be sentenced to imprisonment or fined. Minn. Stat. § 609.50. The Minnesota Supreme Court has recently held that this statute is "[d]irected solely at physical acts * * * namely, physically obstructing or interfering with an officer." *State v. Krawsky*, 426 N.W.2d 875 (Minn. 1988).

■ By analogy this interpretation applies with equal force to § 609.60(2). White's only alleged "interference" was a telephone conversation initiated by firefighters at the scene. He was not physically present at the fire. These actions do not constitute a violation of the statute and cannot be used to impose a standard of care on the deputy fire marshal.

Because Frank's Livestock has no cause of action against White, it is not necessary to consider whether the State might have been vicariously liable. *See Northernaire Productions, Inc. v. County of Crow Wing*, 309 Minn. 386, 388–89, 244 N.W.2d 279, 281–82 (1976).

## II. *Alleged Negligence of Police Officer Robbins and Volunteer Fire Captain Peterson*

Prior to the abrogation of sovereign immunity it was settled law that

[a] public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.

*State v. Susla*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976). The Minnesota Supreme Court recently revived this common law immunity doctrine and applied it to deputy sheriffs. *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988). Whether an employee's conduct receives immunity turns on the facts of the specific case, and "the crucial focus is upon the nature of the act." *Id.* (citation omitted).

■ Because of the generality of the pleadings the specific acts of alleged negligence are not easily isolated. The occurrences listed in the brief center on issues of deployment—dispatching the equipment and firefighters to the fire. These decisions necessarily involve a high degree of discretion and judgment and, under *Elwood*,[1] preclude personal liability.

---

1. The pleadings suggest that Robbins' liability is also premised on his failure to awaken the Frank's household. Although this may not be an act that entails discretion, neither is it a viable basis for a negligence claim. The record provides no support for any connection between a failure to awaken Karen Frank and the claimed damages. Karen Frank awoke 10 minutes after Robbins pounded on her door. The burning building was approximately one city block away from the home, the ground was snow covered, and there is no evidence that the delay affected the condition of the fire or building. Nor is there evidence that Robbins' acts were negligent. An unsuccessful result does not equal negligence. The failure to reach Karen Frank on the phone was apparently caused by her phone being off the hook.

Frank's Livestock alleges that because Peterson is a scrap dealer he did not fight the fire so he could personally gain from the devastated building. There is no evidence to support this claim of malice. Peterson occasionally works as a scrap dealer cutting scrap iron. He is not involved in any corn or products salvage operation. The bare allegation without further support is not sufficient to create a fact issue on the issue of official immunity.

### III. Alleged Negligence of City of Wells, Wells Fire Department, Wells Police Department

Historically, decisions on the deployment of firefighter personnel and resources have not formed the basis for municipal liability. Two separate but inter-related doctrines have insulated these decisions. First, fighting a fire has been considered a duty owed to the general public that does not form the basis for a private cause of action in tort and second, decisions on how and whether to fight a fire have been considered to be discretionary decisions.

The City of Wells and its units contend that as a matter of law they had no duty to Frank's Livestock because there is no private duty to fight fires. They assert that the duty is to the general public. "[G]eneral duties owed to the entire public rather than a specific class of persons cannot form the basis of a negligence action." *Cracraft v. City of St. Louis Park*, 279 N.W.2d 801 (Minn. 1979).

Firefighting has been a public duty in Minnesota for over 100 years. *Grube v. City of St. Paul*, 34 Minn. 402, 26 N.W. 228 (1886). The rationale supporting this doctrine has been explained:

> [i]t must be borne in mind that, while a fire department protects the private property threatened, it is one of the public governmental agencies of the city, for whose mistakes or negligence in subduing a fire the city is not liable to the individual injured thereby. This is placed on the ground that the department, in arresting fires, is discharging a public

governmental or police duty. * * * The citizen whose property is threatened with destruction has absolutely no control over the public fire department * * * his property may be destroyed if, in the judgment of the head of the department, it becomes necessary to do so to arrest a conflagration.

*Erickson v. Great Northern Railway Co.*, 117 Minn. 348, 351–52, 135 N.W. 1129, 1132–33 (1912).

The *Cracraft* decision demonstrates that the public duty exception survived the abrogation of sovereign immunity. *Cracraft*, 279 N.W.2d at 804. However, more recently the public duty exception in Minnesota has been applied only to licensing or inspection cases. *See, e.g., Andrade v. Ellefson*, 391 N.W.2d 836 (Minn. 1986); *Hage v. Stade*, 304 N.W.2d 283 (Minn. 1981); *Lorshbough v. Township of Buzzle*, 258 N.W.2d 96 (Minn. 1977); *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 293 Minn. 220, 199 N.W.2d 158 (1972).

The most recent Minnesota case dealing with the deployment of police and fire personnel did not decide the issue based on the public duty exception but analyzed it under the doctrine of discretionary immunity. *Silver v. City of Minneapolis*, 284 Minn. 266, 170 N.W.2d 206 (1969). That doctrine, codified as Minn. Stat. § 466.02 (1986), provides that a municipality is immune from liability for

> [a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

Minn. Stat. § 466.03, subd. 6 (1986). As in *Silver*, the City of Wells' alleged negligence arises from decisions on deployment of firefighting resources. Under the *Silver* analysis the decision of how many fire trucks to dispatch or whether to expend public funds to obtain heavy equipment would be discretionary.

It is, however, unnecessary to decide whether the proper analysis is under the public duty exception or the discretionary duty exception [2] because the undisputed

2. Because we do not reach the issue of whether

discretionary immunity is applicable, we do not

facts applied to the allegations of the city's negligence support a summary judgment without reaching that issue. As the supreme court stated in analyzing a related issue of discretionary immunity:

> Plaintiff * * * has the burden to show what action or inaction constituted negligence on the part of the city, entitling the plaintiff to recover.

*Chabot v. City of Sauk Rapids,* 422 N.W. 2d 708, 711 (Minn.1988).

Frank's Livestock alleges that the failure to deploy sufficient equipment and personnel to extinguish the fire resulted in damage to the stored corn. It has been conceded that these actions or inactions did not cause or increase damage to the building. It is undisputed that to stop the corn from burning required the removal of the roof. It is also undisputed that the City of Wells did not have the heavy equipment necessary to remove the roof. The theory of liability is consequently reduced to a claim that the City failed to provide heavy construction equipment to remove the roof and limit the damage to the corn.

■ A failure or omission can constitute negligence only when there is a duty to act affirmatively. *Ruberg v. Skelly Oil Co.,* 297 N.W.2d 746, 750 (Minn.1980). Frank's Livestock seeks to impose on the City of Wells an affirmative duty to engage private heavy construction equipment and personnel at public expense to limit their economic loss. There is no authority which would support the existence of such a duty. Although one of the depositions refers to a previous fire during which the department obtained heavy equipment, it was used to contain the fire, not prevent economic loss. Karen Frank understood that she had the option of obtaining the equipment herself and she acted on that option. The fire department provided all of its resources over a 6-hour period to assist in that effort. As a matter of law, under the facts of this case and the theory on which it is pleaded, there is no affirmative duty on the City of Wells to provide heavy construction equipment to mitigate economic injury.

decide whether the City of Wells' purchase of insurance from the League of Minnesota Cities

### IV. *Costs and Disbursements*

The trial court allowed respondents costs and disbursements after granting their motion for summary judgment. The awarding of costs and disbursements is within the discretion of the trial court, and that determination will not be reversed absent a clear abuse of discretion. *Striebel v. Minnesota State High School League,* 321 N.W.2d 400, 403 (1982). "The standard by which the court's discretion is measured is whether expenditures are *reasonable.*" *Olsen v. Special School District #1,* 427 N.W.2d 707 (Minn.Ct.App.1988).

■ Frank's Livestock does not argue that the costs and disbursements are unreasonable in amount, but contends that the issuance of the trial court's order without a memorandum in support is a per se violation of the trial court's discretion. No authority is advanced to support this position nor do we believe that any exists.

### DECISION

The trial court did not err in granting respondents' motions for summary judgment. There is no disputed fact issue which would provide a basis for liability of any of the respondents.

AFFIRMED.

Insurance Trust constitutes a waiver of immunity.