**Jon SOUCEK, Respondent,**

**v.**

**Donald BANHAM, Jr., Dennis Hamilton, and Kim Hedberg, individually and in their capacities as officers of the Minneapolis Police Department, and the City of Minneapolis.**

**No. C2–92–2466.**

Court of Appeals of Minnesota.

July 13, 1993.

Donald H. Nichols, Minneapolis, for respondent.

Robert J. Alfton, Minneapolis City Atty., Edward A. Backstrom, Asst. City Atty., Minneapolis, for appellants.

Considered and decided by RANDALL, P.J., and SHORT and AMUNDSON, JJ.

## OPINION

RANDALL, Judge.

Appellants are three police officers of the Minneapolis Police Department, Donald Banham, Jr., Dennis Hamilton, and Kim Hedberg, (officers) and the City of Minne-

apolis (city). Respondent Jon Soucek commenced this action against appellants after the officers shot and killed respondent's dog. Respondent's dog was a German Shepherd named "Mack." The officers claim they believed the animal was a wolf. In his complaint, respondent alleges negligence per se, intentional and/or negligent infliction of emotional distress, and negligent supervision. Appellants moved for summary judgment based upon official immunity and discretionary function immunity. Concluding the evidence is in substantial conflict as to whether the actions of the officers amount to willful and malicious conduct, the trial court denied the summary judgment motion.

The officers and city filed this appeal pursuant to *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986) (denial of summary judgment where motion is based upon immunity from suit is appealable as of right). We affirm in part and reverse in part.

## FACTS

Respondent Jon Soucek was the owner of a one-and-a-half-year-old shepherd-mix dog. The dog was an obedience-trained family pet known in the neighborhood to be gentle. The dog got along well with family, friends, and neighbors, including children. At approximately 11:30 p.m. on October 20, 1990, the dog accidentally got loose from respondent's back yard. At around the same time on the same night, the Minneapolis police dispatcher received calls from two different people identifying what they believed to be a "wolf."

At approximately 2:26 a.m., Officer Banham spotted the animal near Third Street and Second Avenue in downtown Minneapolis. Less than two minutes later, Officer Banham ordered that the animal be "taken."[1] Within one-and-a-half minutes, the animal had been shot between seven and fifteen times by three different officers. Shortly thereafter, Laura Reavis, a warden of the Minneapolis Animal Control, arrived on the scene, but the dog was already dead. The animal was transported to the Minneapolis Animal Control facility.

Respondent Soucek did not find out about the death of his dog until the next day. According to Soucek, when he discovered the dog had gotten loose on the night of the incident, he went looking for it from approximately 12:45 a.m. until 3:30 a.m. Unsuccessful in his search, he went to bed. The following morning, when he saw that the dog had not returned home, he telephoned the dog pound and was told a dog similar in description had been shot and killed the night before. When respondent asked why they did not call him, he was told the dog had no identification tags on it. This relieved respondent's fears somewhat because his dog wore a collar and I.D. tags.

Respondent, accompanied by his roommate and a friend, went to the dog pound. When they arrived at the pound, respondent was taken to a metal shack in the back of the building. On the floor of the shack was a dog that was "shot up." Respondent turned the dog over and recognized it as his dog. Respondent cried as he held the dead animal. He told his friend to get his roommate back so she would not see the dog. Respondent's description includes graphic details of the scene. Eventually, after some difficulty because of the large amount of blood, respondent got the body of his dog into the trunk of his car. While at the pound, respondent was told

1. The trial court file contains a list of calls received by the Minneapolis Emergency Communications Center (MECC) concerning an animal. However, the record does not disclose the contents of those calls. According to the affidavit submitted by an assistant city attorney, he listened to the tape recordings and, according to him, the recordings contain the following information:

The Minnesota Emergency Communication Center (MECC) contacted and informed the DNR of the situation at 1:33 a.m. During a second telephone conversation with the DNR, the MECC was advised that conservation officers could not arrive in Minneapolis for at least 40 minutes, that a tranquilizer for a wolf was going to present a problem, and that the animal would not feel the effects of the tranquilizer for about 15 minutes after being shot. This information was transmitted over police radio to the officers in the field. The second conversation with the DNR terminated at 2:06 a.m.

that although the dog had not done anything wrong, the dog was shot because the police thought it was a wolf.

In his deposition testimony, Banham said he believed the animal was a wolf when he shot at it. Banham testified that when he first saw the animal at 2:25 a.m., it was on the sidewalk along Third Avenue. Banham drove parallel with the animal and was within ten feet of it. In an attempt to ascertain whether it was a dog, Banham called and whistled to it. The animal continued walking or trotting in the same direction. It did not come toward Banham nor did it shy away. When Banham first saw it, it was trotting on the sidewalk of either Washington or Third Avenue. It moved into the street at one point, then back toward the sidewalk. Banham claimed he did not see a collar on the animal.

According to Banham, although the animal took no aggressive action toward him, he decided to shoot at what he believed to be a wolf for reasons of public safety. After he fired four shots, the animal collapsed but was still alive. Banham then told Officer Hamilton to shoot the animal with a shotgun for humane purposes. Hamilton did so. Officer Banham then approached the animal and, because it was still alive, shot it again. Banham also stated that Officer Hedberg took "a bunch of shots." Banham stated that upon the arrival of the animal warden, Laura Reavis, two of his officers helped her load the animal onto a truck.

Respondent presented to the court at the summary judgment hearing several affidavits by eyewitnesses directly contradicting the official or police version of the facts. For instance, in her sworn statement, Laura Reavis stated:

2. On the night Mack was killed by the Minneapolis Police, I received a call from ECC in regards to a "large dog attacking people." The ECC dispatcher stated the animal was identified as a wolf. Upon my arrival at the shelter, I called ECC to get a location of the animal. They stated the location as 3rd Avenue North and 1st Street North. I went to this location and found no one in the area. I then attempted to reach ECC by radio and no one would answer. I then returned to the shelter and was then given a new location. While en route, I was beeped on and returned to the shelter and was informed of an injured dog at another location. I was also given the location of 3rd Avenue South and Washington Avenue as the location for the dog (Mack). I told them I was only a few minutes away and would be right there. I told them to hold off shooting him because I was almost there. Upon arrival, the dog was already dead. There was a great deal of happiness and celebration by the police. They were laughing and saying, "We got the dog, we got the dog." It was clear they knew it wasn't a wolf. At first they said to me (sarcastically, I felt) "Get back? It's still alive!" I told them it was dead. They said, "It should be—we blasted it enough."

3. When I attempted to load the dog into my truck I was pushed out of the way so the police could take pictures. They took turns posing over the dog as if they were bounty hunters. They would put one foot on the dog and hold a rifle while another cop would take a picture. One officer with dark hair and a mustache came up to me with a big grin and said, "Nice looking 'wolf', huh?" In a tone of voice emphasizing he knew it wasn't a wolf, but that he would pretend it was. All the police taking pictures and joking were white males. The two women police stood back and were obviously disgusted by the whole thing.

4. As they were having fun taking pictures, I told them I had to go get an injured dog. They wanted to finish their pictures. I asked them for some help but they said, "No way—I don't want blood on my hands" or "I hurt my back." I finally got into the truck at which point I hurt my leg in my attempt to load the dog. I had told the cops that the dog was only a shepherd but they didn't seem to care at all.

5. Later, two cops came to see Mack's body at the pound saying, "We wanna

see how shot up it is." They bragged about a dog they'd shot the day before.

6. I was sickened by the whole thing but was told by my work that if I said anything about what I knew my job was on the line. Also, every time Mr. Soucek tried to contact me about what I saw, my supervisors lied to him about my not being in town or out on call when they had actually been keeping me busy in the back of the shelter.

7. They also told me that I'd better not talk to Soucek or his lawyers. I was afraid for my job at that time, but now that I don't work there anymore, I feel I can come forward with what I saw.

Other eye witnesses to the shooting who submitted affidavits are Douglas Anderson, John Lundstrom, Pat Boggs, and Audrey Rockenbach. Generally, they stated it was obvious the animal was a dog, and not a wolf. They also stated the animal showed no aggression toward anyone and that even after the shooting began, the dog was very submissive, with its head down and its tail between its legs. They reported hearing up to 15 shots. The officers were joking and laughing about the size of the dog, stating "what a big dog," and "we got him, we got him." Douglas Anderson stated the officers were trying to get a group photograph after the dog had been killed. Anderson's affidavit stated:

2. At approximately 2:30 a.m. on Sunday, October 21, 1990, Pat Boggs and I were at my parents watching a movie. That ended quite late—around 2:30. Then we left the condominium on Washington and Second. As soon as we got out the door, we heard a shot. We ran towards where the shots were coming from. We saw about 5 police cars. We also saw a dog. It was just a big dog. I'd never have considered it a wolf. It was just a big dog. At first, I didn't think the dog was even relevant to what they were doing. I thought something big was going on like a murder or hostage situation and it took me a bit to figure out that they were really shooting at the dog after the dog got hit.

3. We had heard three shots and the dog was in the parking lot. I still just thought the dog was in the way of something else they were shooting at. When we got really close, right there, the dog had been shot twice and his back legs had gone out from under him. And he was still up on his front paws. We could make eye contact with him. He was looking around at everybody like he didn't know what was going on. In no way did he look like a wild animal with puppy eyes like that. He was still up on his front paws and they shot him in the front and he fell down. That was a shotgun, too, after they had gone to the trunk. They went to the trunk rather slowly. It wasn't like as soon as possible. I don't know if they were getting shells or what, because they already had at least one shotgun out. I thought a black officer shot him with a shotgun. A couple of them had shotguns out.

4. Then the animal went down from there and appeared to be dead. He twitched once and another officer shot him with a pistol. So altogether we heard at least 7 shots.

5. At that point Pat was saying things like, "Don't you think that's enough?" And then after the last pistol shot the Animal Control van finally pulled around to get the dead body. They pulled him to the van and were commenting on how much blood there was. They were joking around like, "Boy that's a big dog. I can't believe it bled so much." Then when they were dragging him they said something like, "Somebody get a camera—let's get a group photo of this one." And Pat started saying in disgust, "You gotta be kidding me." Like commenting on their lack of professionalism, maybe.

6. They all kind of jokingly went up to it like they were actually going to take a group photo and then they laughed.

7. I hope they don't go around shooting everybody's dog. He was just a German shepherd. Was obviously not a wolf.

8. They got huffy with Pat for speaking his mind ... like they knew they

were doing something wrong and they didn't want to hear anything about it.

9. We were right by the dog when the shooting was going on. They weren't concerned about anybody's safety. There were shots' all over. They were just bam, bam, bam, bam, bam, bam.

10. I couldn't believe all those cops were there for just one dog. It was only when he went down that I knew. He wasn't growling or even barking. He wasn't attacking at all. Not even a cry came out of him. All I remember was his eyes ... his sad eyes.

11. It seemed like they were picking weapons and ammunition—like for variety. It was a shooting spree as far as I'm concerned. I don't think their objective was for protecting the public. It was just "let's shoot it." I'm surprised someone else didn't get shot, because there was a lot of gun fire. It was incredibly loud with all those buildings around.

12. He was covered with blood. I remember his head, the puddle of blood. His eyes.

13. When the female animal control officer came up and dragged him, they were still joking around at that point.

14. There were so many police cars and that van was on the right side of the road. It could have been waiting there. I couldn't believe there were so many police cars for one dog.

15. They really were on a high horse—arrogant. They obviously enjoyed this whole event.

The other affidavits corroborated each other and the affidavits of Reavis and Anderson. Nancy Pryzymus, assistant supervisor of animal control, testified in her deposition that when the dog was brought in it did have a collar on but no i.d. tags. Dr. Philip Nelson, a veterinarian, examined the dog the morning after it was killed. He found at least eight bullets in the dog's body.

In support of their assertion that they believed the animal was a wolf, appellants stated the animal warden listed the animal as a timberwolf on the impound records and the DNR officials who examined the animal at the animal control facility expressed the opinion that the animal might be part wolf. These facts, however, appear nowhere in the trial court file other than in the statement of the facts contained in defendant's memorandum of law in favor of summary judgment. Appellants also stated that according to their depositions, all of the police officers involved in the incident believed the animal was a wolf and a threat to public safety and, none of the officers involved saw a collar or tags on the animal. However, the only deposition of a police officer that appears in the trial court file is that of Officer Banham. Furthermore, only portions of Banham's deposition appear in the file. At the hearing, appellants denied that photographs were taken.

On appeal, the officers continue to claim they did not know the animal was a dog and actually believed it was a wolf when they killed it. The officers claim they had no reason to believe otherwise until they heard allegations through the media the following week. Respondent claims the facts demonstrate the officers knew the animal was a dog, the officers acted in bad faith, and with malicious intent in killing the dog.

The trial court concluded that respondent had produced enough credible testimony to put in dispute material facts surrounding the shooting, namely, whether the actions of the officers amount to willful and malicious conduct. Based on this conclusion, the trial court denied appellants' motion for summary judgment on the issues of immunity and emotional distress.

### ISSUES

1. Did the trial court err by denying appellants' defensive motion for summary judgment based upon official immunity?

2. Did the trial court err by denying appellants' defensive motion for summary judgment based upon discretionary immunity?

3. Did the trial court err by denying appellants' defensive motion for summary

judgment on the issue of emotional distress?

## ANALYSIS

### Standard of Review

■ When reviewing a summary judgment motion, this court must determine whether (1) any genuine issues of material fact exist and (2) whether the trial court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The evidence must be viewed in the light most favorable to the nonmoving party. *Id.*

## I.

### Official immunity

■ The "official immunity" doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages *unless he is guilty of a willful or malicious wrong.*"

*Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn.1988) (emphasis added) (quoting *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)); *see also Johnson v. Morris*, 453 N.W.2d 31, 41–42 (Minn. 1990). The question of whether official immunity exists may be appropriately resolved on summary judgment. *See Elwood*, 423 N.W.2d at 679; *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. App.1990), *pet. for rev. denied* (Minn. Feb. 28, 1990). However, whether an officer acted willfully or maliciously is usually a question of fact to be resolved by a jury. *Johnson*, 453 N.W.2d at 42; *Elwood*, 423 N.W.2d at 679. The doctrine of official immunity is

> intended to insure that the threat of potential personal liability does not unduly inhibit the exercise of discretion required of public officials in the discharge of their duties.

*Holmquist v. State*, 425 N.W.2d 230, 233 n. 1 (Minn.1988).

■ Whether official immunity applies requires the court to focus on the nature of the particular act in question. *Johnson*, 453 N.W.2d at 42; *Elwood*, 423 N.W.2d at 677; *Frank's Livestock & Poultry Farm, Inc. v. City of Wells*, 431 N.W.2d 574, 577 (Minn.App.1988), *pet. for rev. denied* (Minn. Jan. 25, 1989). If the official duty is "ministerial," no immunity exists. An act is ministerial where it is "absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Elwood*, 423 N.W.2d at 677 (quoting *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)).

■ Generally, the duties of law enforcement and crime prevention by police officers are considered discretionary duties entitling them to official immunity from state law claims. *Johnson*, 453 N.W.2d at 41–42; *Elwood*, 423 N.W.2d at 678. However, whether an officer's conduct merits immunity is controlled by the particular facts of each case. *Johnson*, 453 N.W.2d at 42; *Elwood*, 423 N.W.2d at 678; *Wells*, 431 N.W.2d at 577. Even if the conduct involved is discretionary, there is no immunity where the conduct is willful or malicious.

> Malice "means * * * the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right."

*Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991) (quoting *Carnes v. St. Paul Union Stockyards, Co.*, 164 Minn. 457, 462, 205 N.W. 630, 631 (1925)). However, in addition to intent or wilfulness, the defendant must have had "reason to know that the challenged conduct [was] prohibited" before the wilful or malicious wrong exception to official immunity will apply. *Id.*

The trial court concluded the facts were in substantial conflict as to whether the actions of the officers amount to willful and malicious conduct. We agree.

■ The material fact in dispute is whether the officers "truly believed" the animal was a wolf at the time they killed it. If the officers truly felt the animal was a wolf, even if this belief was innocently

misguided, their actions would not amount to malicious conduct and the doctrine of official immunity would apply. But the trial court properly concluded there was sufficient evidence produced by respondent contradicting the officers' version of the facts, and thus summary judgment disposition was inappropriate.

The resolution of the officer's intent will turn on the credibility of the witnesses and other evidence. Viewing the evidence in the light most favorable to respondent, the nonmoving party, a jury could reasonably conclude the officers knew the animal was a dog when they shot it and they were acting with willful intent. The affidavits of Laura Reavis and other eyewitnesses put the police version in serious dispute.

Even from the officers' version of the facts, a jury could make reasonable inferences tending to support respondent's position. For instance, Banham testified that shortly before the shooting he observed the animal from within ten feet as he drove parallel with the animal trying to get its attention. It was not aggressive, was not showing any apparent concern that it was in the unfamiliar environment of an urban area, and did not bolt when a vehicle drove within 10 feet of it and a person whistled and called to it. A jury could reasonably conclude from these acts of the animal, that the animal was acting like a domestic pet rather than a stray wolf.

Further, Banham's deposition stated that he had some prior experience as an animal control officer. A jury could reasonably conclude that if there is one dog a Minneapolis police officer with experience in animal control would know is not a wolf, even though it might have the body configuration of a wolf, it is a German Sheperd. The Minneapolis police department has an active K-9 unit and the majority of those animals, which the police work with on a regular basis, are German Sheperds.

The seminal issue in this case is the sincerity of appellants' position that they believed the animal was a wolf. Because this material fact is in dispute, denial of summary judgment based on official immunity was appropriate.

## II.

*Discretionary immunity*

The general rule for tort liability of a municipality is

> every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function.

Minn.Stat. § 466.02 (1990). However, as an exception to municipal tort liability, there is no municipal liability for

> [a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

Minn.Stat. § 466.03, subd. 6 (1990).

■■■ Whether the doctrine of discretionary immunity applies is a question of law. *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 786 (Minn.1989). This court is not bound by the trial court's determination of a purely legal question. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

■■■ Discretionary function immunity "seeks to protect policy-based decisions and prevent the impairment of effective government." *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 719 (Minn.1988). Its purpose is to "assure that the courts do not pass judgment on policy decisions entrusted to coordinate branches of government." *Holmquist*, 425 N.W.2d at 231. In applying discretionary function immunity, the governmental conduct challenged must be examined. *Nusbaum*, 422 N.W.2d at 722. There is a generally recognized distinction between planning level decisions, which are protected, and operational level decisions, which are unprotected. *Schaeffer v. State*, 444 N.W.2d 876, 879 (Minn. App.1989).[2] Generally, conduct occurring

---

2. *See also Hansen v. City of Saint Paul,* 298 Minn. 205, 214 N.W.2d 346 (1974) (where city

officials had knowledge that two dangerous dogs were loose, the decision of the dogcatchers

at a planning level is insulated from suit because it involves policy considerations. *Nusbaum,* 422 N.W.2d at 722; *see also Holmquist,* 425 N.W.2d at 232 (a planning level decision is one which involves "the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy"). Conduct occurring at an operational or ministerial level is less likely to involve policy considerations and is generally not protected. *Nusbaum,* 422 N.W.2d at 722. An operational level decision involves "conduct which merely puts into effect a predetermined plan." *Gonzales v. Hollins,* 386 N.W.2d 842, 845 (Minn.App.1986).

Although recognized, the planning-operational distinction should not be used in a conclusory manner. After identifying the precise governmental conduct that is being challenged, "[t]he critical inquiry * * * is whether the challenged governmental conduct involved a balancing of policy objectives." *Nusbaum,* 422 N.W.2d at 722; *see also Pletan v. Gaines,* 494 N.W.2d 38, 43 (Minn.1992) (the underlying consideration is "whether the conduct involves the balancing of public policy considerations in the formulation of policy"). Even where decisions require the exercise of professional judgment,

> the professional evaluation of complex factors does not "convert" an operational decision into a discretionary function, *absent a demonstration that immunity is essential to avoid judicial interference with governmental policymaking.*

*Invest Cast, Inc. v. City of Blaine,* 471 N.W.2d 368, 371 (Minn.App.1991) (citation omitted) (emphasis added) (tactical decisions regarding methods used to fight a fire, such as where to position firefighters and how to apply the water, were operational in nature and therefore unprotected, even though the decisions required the exercise of professional judgment); *pet. for rev. denied* (Minn. Aug. 1, 1991); *see also Gorecki v. County of Hennepin,* 443

N.W.2d 236, 241 (Minn.App.1989) (employee's decision not to remove a snow bank from a bridge, where the decision was not based upon any particular policy but rather was based upon professional judgment that the snow build-up was not a problem, was not protected by discretionary immunity because the exercise of professional judgment did not involve policy considerations), *pet. for rev. denied* (Minn. Sept. 27, 1989).

The challenged conduct here is the shooting of the animal. Thus, the question is whether shooting the animal involved the balancing of public policy considerations in the formulation of policy or the mere implementation of established policy.

A portion of the deposition of Chief John T. Laux of the Minneapolis Police Department appears in the record. Regarding the policy of the department, Chief Laux testified as follows:

Q. Do you know what the policy and procedure manual says about killing pets?

A. Specific language, no.

Q. Do you believe it has any language in it?

A. That is the policy that we will refer issues of animal safety, animal control, to the health department who has responsibility of caring for, disposing of, and picking up lost, stray, endangered, whatever the case is with animals. We may also, if appropriate, call the Department of Natural Resources through the dispatcher if that is deemed appropriate.

Q. Is this policy actually written down?

A. I'm not sure that I could turn to the manual and find it written that specifically. It has been common practice for as long as I've been on the department, for 24 years.

Notification of the DNR applies in cases involving wild animals. The officers notified both animal control and the DNR of the situation but acted before either came and acted without the advice of either.

not to capture the dogs until after lunch was at an operational level and therefore, was not protected conduct); *Silver v. City of Minneapolis,* 284 Minn. 266, 170 N.W.2d 206 (1969) (deployment of police forces to control civil unrest was an executive policy decision and therefore, was protected as a discretionary function).

Appellants argue the officers had to formulate new policy as the situation with the animal developed. Appellants argue they were faced with a novel situation which, when implementing the departmental policy, required the "formulation of new policy." We are not persuaded. We conclude, rather, appellants' decision in how to deal with an animal on the loose was simply the ministerial implementation of the city's policy. They exercised their professional judgment at the operational level, not the planning level. Case law is clear that operational decisions putting into effect a predetermined plan are not protected by discretionary immunity.

The trial court properly concluded the challenged conduct occurred within the course of operations and implementing policy rather than within the scope of bona fide policy making. Appellants are therefore not immune from suit on the grounds of discretionary immunity.

### III.

*Emotional distress*

 The officers and city filed this appeal pursuant to *Anderson v. City of Hopkins,* 393 N.W.2d 363, 364 (Minn.1986) (denial of summary judgment where defensive motion is based upon immunity from suit is appealable as of right). Appellants also request that this court review the denial of summary judgment on the claim of emotional distress.

In their notice of appeal, appellants raised the issue of emotional distress, seeking review pursuant to *Hunt v. Nevada State Bank,* 285 Minn. 77, 172 N.W.2d 292 (1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970). Based on reasons of judicial economy, the court in *Hunt* allowed review of otherwise nonappealable orders where an appeal was properly taken from an appealable order. *Id.* at 89, 172 N.W.2d at 300. Furthermore, Minn.R.Civ.App.P. 103.04 provides in part:

On appeal from or review of an order the appellate courts may review any order affecting the order from which the appeal is taken * * *. They may review

any other matter as the interest of justice may require.

In the interests of both justice and judicial economy, we will extend review to the emotional distress issue.

 Minnesota recognizes intentional infliction of emotional distress as a separate and independent tort. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 438 (Minn.1983). That is, it need not be accompanied by physical injury or be the natural result of some other actionable tort. *Id.* There are four necessary elements of the tort of intentional infliction of emotional distress:

(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe.

*Id.* at 438–39. The operation of the tort is sharply limited to cases involving particularly egregious facts. *Id.* at 439.

In response to appellants' motion for summary judgment, respondent only addressed the claim for negligent infliction of emotional distress. We conclude respondent has abandoned the theory of intentional infliction of emotional distress.

 In an action for negligent infliction of emotional distress, the plaintiff must show that he was within the "zone of danger," and reasonably feared for his safety. *Stadler v. Cross,* 295 N.W.2d 552, 553 (Minn.1980). However, an exception to the "zone of danger" rule is available if the plaintiff can show "a direct invasion of his rights, such as defamation, malicious prosecution, or other willful, wanton or malicious conduct." *Bohdan v. Alltool Mfg. Co.,* 411 N.W.2d 902, 907 (Minn.App.1987), *pet. for rev. denied* (Minn. Nov. 13, 1987) (citing *State v. Farm Mut. Auto. Ins. Co. v. Village of Isle,* 265 Minn. 360, 367–68, 122 N.W.2d 36, 41 (1963)). Relying on *Bohdan,* the trial court denied summary judgment for appellants on this issue because the facts are disputed as to whether the officers' actions in shooting the animal were malicious.

■ Appellants argue there must be conduct on the part of the defendant which constitutes an intentional tort against the plaintiff before a cause of action for negligent infliction of emotional distress will lie. Appellants' position is based on the premise that general malicious or wilful conduct is not sufficient for a cause of action for negligent infliction of emotional distress.

However, this court has stated:

The elements that must be proved to prevail in a suit for negligent infliction of emotional distress are that there be a *negligent* action that causes emotional distress and that there is an accompanying physical injury.

*Christenson v. Argonaut Ins. Co.*, 380 N.W.2d 515, 518 (Minn.App.1986), *pet. for rev. denied* (Minn. Mar. 27, 1986). An underlying intentional tort is not required to plead a cause of action for negligent infliction of emotional distress if physical injury is present.

■ However, we conclude respondent has no cause of action for negligent infliction of emotional distress because there was no direct invasion of *his* rights. *See Bohdan*, 411 N.W.2d at 907. It is undisputed that the officers did not know respondent was the owner of the dog. As willful or malicious as a jury might find appellants' conduct to be, it was directed at the animal and not at its owner. We have found no law supporting respondent's derivative claim.

■ Furthermore, we note that even if the conduct of the police officers would sustain a cause of action for negligent infliction of emotional distress, the requirement of an accompanying physical injury is lacking. The supreme court has recently reiterated:

Because emotional distress is highly subjective, often transient, and easily alleged, our tort law, in addition to a "zone of danger" requirement, also requires physical manifestation of the distress as proof of the genuineness and gravity of the emotional suffering.

*Garvis v. Employers Mut. Casualty Co.*, 497 N.W.2d 254, 257 (Minn.1993). Although the court was not applying the malicious conduct exception to the zone of danger rule, a fair reading of the statement implies that physical manifestations are required whether the general rule, zone of danger, or the exception, malicious conduct, is being applied. The Restatement (Second) of Torts also requires physical manifestation of emotional distress before one may recover for negligent infliction of emotional distress. *See* Restatement (Second) of Torts § 436A (1965). Respondent has made no assertions in the pleadings or elsewhere of physical manifestations of emotional distress he allegedly suffered as a result of the officers' actions. Nor has respondent presented any evidence of this nature.

On this record, even viewing the facts in the light most favorable to respondent, we do not find sufficient threshold evidence to sustain a cause of action for negligent infliction of emotional distress. Appellants' actions were concentrated solely on a stray animal, not personally toward respondent. Also, there is no evidence of physical injury accompanying respondent's emotional distress.

## DECISION

We affirm the denial of appellants' motion for summary judgment based on official immunity. There is a substantial dispute over a material fact—whether the officers sincerely believed the animal was a wolf when they shot it.

We also affirm the denial of appellants' motion for summary judgment based on discretionary immunity. The challenged conduct occurred because of the officers' professional judgment as to how to handle a situation with a stray animal. Their course of conduct was strictly operational, not policy making.

However, we reverse the denial of summary judgment on the issue of emotional distress. There was no willful, wanton, or malicious conduct directed at respondent. Furthermore, there is no claim of physical injury accompanying the alleged emotional distress.

**Affirmed in part, reversed in part.**

SHORT, Judge (concurring specially)

I concur in the majority opinion on the official immunity issue only insofar as it concludes there are facts in dispute as to the officers' conduct. I write separately because I am concerned we are weighing the evidence on that issue. *See Prince v. Sonnesyn*, 222 Minn. 528, 536, 25 N.W.2d 468, 472 (1946) (conflicts in evidence are not to be resolved on appeal).