David M. **JOHNSON,** as Trustee for the Heirs and Next of Kin of Brandon Maurice Johnson, Deceased, Respondent,

v.

**WASHINGTON COUNTY,** Appellant (C6–92–2406), Respondent (C8–92–2472),

**South Washington County School District No. 833,** Respondent (C6–92–2406), Appellant (C8–92–2472).

Nos. C6–92–2406, C8–92–2472.

Supreme Court of Minnesota.

June 30, 1994.

---

Lawrence J. Hayes, Jr., Eagan, for appellant.

Richard J. Chadwick, Minneapolis, for Washington County.

Earl P. Gray, St. Paul, for David M. Johnson.

Carla Heyl, League of Minnesota Cities, Shoreview, for amicus League of MN Cities.

Jim Mulder, Assoc. of MN Cities, St. Paul, for amicus Assoc. of MN Cities.

## OPINION

WAHL, Justice.

This wrongful death action arose out of the drowning of seven-year-old Brandon Maurice Johnson at the Lake Elmo Park Reserve while he was participating in an extended day program of South Washington County School District No. 833 (district). A Washington County district court jury found the district and Washington County (county) liable for Brandon's death. The jury apportioned liability 40% to the district and 60% to the county and awarded damages of $1,007,-857.84. The court of appeals affirmed the verdict as to the district, but reversed as to the county, holding that the trial court erred in not according the county immunity from the plaintiff's claim. *Johnson v. Washington County*, 506 N.W.2d 632 (Minn.App.1993). Before this court the district argues that the county was improperly found to be immune, that the trial court erred in denying the district's motions for a new trial on grounds of attorney misconduct and improper admission of evidence, and that the trial court improperly denied the district's motion for remittitur or a new trial for excessive damages. For reasons set out below we affirm the court of appeals.

Brandon and his sister Kristina attended the South Washington County Schools Extended Day Program in the summer of 1990.

On June 14, 1990, Brandon and a class of thirty-seven went on a field trip to Lake Elmo Park Reserve to go swimming in the Lake Elmo Reserve Pool. Kristina did not attend.

The trip was planned and supervised by four school district extended day program employees. Only one of the supervisors knew how to swim, and she had no water safety training. The staff rules required the supervisors to enter the water, to count children at safety breaks, and to alert and help lifeguards if a child was in danger. The supervisors had swimming rules for the children: each child must choose a partner (or buddy), stay with the partner in an assigned area of the beach at all times, stay away from filter boxes and buoys, and ask permission of the group leader before getting a drink or going to the bathroom. The supervisors read the rules to the children two or three times, although at one reading Brandon was crawling under chairs. For his partner, Brandon chose a friend who was older and eleven inches taller. The supervisors did not test the swimming ability of the children, but instead relied on the children's own estimate of their swimming ability. Each supervisor was in charge of a group of ten or fewer children.

The Reserve Pool is an artificially created swimming pond with a sand beach and bottom. The bottom slopes from very shallow to six feet deep in the middle with no sudden drop-offs. The water is murky one foot below the surface. No depth markers or ropes divide the areas for swimmers and for non-swimmers.

The school district bus arrived at the park reserve at approximately 1:35 p.m. The class was expected by the head lifeguard. Five lifeguards were on duty and about three hundred people were at the pool. Before the children entered the water, the supervisors reminded them of the rules, including the requirement to stay with their buddies.

At approximately 1:50 p.m. one of the supervisors saw Brandon alone in shallow water. She asked Brandon where his buddy was and told Brandon to go find him. The supervisor then turned to talk to some other

children and did not see where Brandon went. At about 1:55 p.m. the on-the-hour break was called and, after everyone left the water, the four supervisors counted the children in their groups. Brandon's supervisor discovered that Brandon was missing. She asked the other supervisors if they knew where he was. The head lifeguard, passing by, overheard the conversation and asked for a description of Brandon and where he was last seen. A child pointed toward the water.

The head lifeguard went to the lifeguard shack and told the other lifeguards about the missing child. One lifeguard called 911 while other people checked the bathroom, parking lot, and playground. Initially, no one searched the water. After asking the concession stand worker to announce, over the intercom, that Brandon should come to the stand, the head lifeguard returned to the beach where she attempted to organize a human chain to search the water. First, only fragmented chains were formed. The head lifeguard participated in one such chain and then went to the parking lot to wait for the ambulance. Later, she returned to the swimming area and organized one long human chain. On the first sweep the long chain made through the pond, Brandon's body was found submerged in about four feet of water. The body was carried out of the water at approximately 2:15 p.m.

The jury found that the negligence of the district and county caused Brandon's death, apportioned liability 40% to the district and 60% to the county, and awarded damages of $1,007,857.84. Both the district and the county moved for a new trial or, in the alternative, remittitur. Their new trial motions were based on allegations of opposing counsel misconduct, erroneous evidentiary rulings, and excessive damages. In addition, the county moved for judgment notwithstanding the verdict, arguing that it was immune from liability and that the plaintiff had failed to prove his case. The county also argued that if it was liable Minn.Stat.

§ 466.04 (1992) limited its liability to $200,000. The trial court limited the county's liability to $200,000 and denied all other motions. The court of appeals reversed, in part, holding the county immune from liability. 506 N.W.2d at 637. We accepted review.

■ We consider first whether the court of appeals erred in holding the county immune from liability.[1] The trial court refused to grant the county immunity from the wrongful death claim because, in the trial court's view, the county had created a duty to protect those swimming in the Reserve Pool by constructing an artificial swimming pool and hiring lifeguards certified in life saving techniques. The court of appeals reversed holding the county immune pursuant to section 466.03, subd. 6e (1992). 506 N.W.2d at 637.

With certain exceptions, municipalities are liable for their torts. Minn.Stat. § 466.02 (1992). Minn.Stat. § 466.03, subd. 6e provides a limited exception for park and recreation areas. Municipalities are immune from

> [a]ny claim based upon the construction, operation, or maintenance of any property owned or leased by the municipality that is intended or permitted to be used as a park, as an open area for recreational purposes, or for the provision of recreational services, or from any claim based on the clearing of land, removal of refuse, and creation of trails or paths without artificial surfaces, if the claim arises from a loss incurred by a user of park and recreational property or services. Nothing in this subdivision limits the liability of a municipality for conduct that would entitle a trespasser to damages against a private person.

Section 466.03, subd. 6e.

■ We agree with the court of appeals that the Reserve Park, including the artificially created swimming pond, is a "property * * * intended or permitted to be used as a park * * * for the provision of recreational services."[2] In addition, the plaintiff's claim

1. The district and plaintiff contend that the county waived its immunity claim. In the county's answer to Johnson's complaint, the county stated that the "claims of plaintiff are barred by Minn. Stat. § 466.03." This provided sufficient notice

of the claim and we therefore find that the county did not waive its immunity claim.

2. The court of appeals recently considered whether an artificially created swimming pond

is based on the county's operation of the park and arises from the use of the park and park services. The county, therefore, is immune pursuant to section 466.03, subd. 6e from the wrongful death claim unless its conduct "would entitle a trespasser to damages against a private person."

To determine whether a trespasser would be entitled to damages against a private person in this case, we first must determine what specific trespasser statute applies. Recently, we considered the Minnesota Tort Claims Act, Minn.Stat. § 3.736, subd. 3(h) (1992), which grants the state and its employees limited immunity from liability arising from the use of state parks, "except that the state is liable for conduct that would entitle a trespasser to damages against a private person." *Sirek v. State, Dep't of Natural Resources,* 496 N.W.2d 807, 809 (Minn.1993) (quoting Minn.Stat. § 3.736, subd. 3(h)). In *Sirek* we held that the general trespasser standard of *Restatement (Second) of Torts* § 335 (1965) rather than the heightened "child trespasser" standard of § 339 applies to a child accompanied by an adult in a state park. *Id.* at 811. The court was wary of requiring the "child proofing" of state parks and recognized that "[w]hen small children are being watched by their parents, or entrusted persons in supervision, landowners may be relieved of the duty to warn them of or remove dangerous instrumentalities the danger from which is apparent." *Id.* (quoting *Strode v. Becker,* 206 Ill.App.3d 398, 151 Ill.Dec. 420, 425, 564 N.E.2d 875, 880 (1990)).

■ Our analysis in *Sirek* also applies to a claim arising from the use of a county park; the immunity statutes are essentially identical and the policy considerations are the same. The district argues that this case is distinguishable from *Sirek* because here children age seven and older were allowed to enter the water unaccompanied by an adult while in *Sirek* children had never been observed walking unaccompanied in the park.

However, even though Brandon entered the water alone, he, like the child in *Sirek,* was under the supervision of adults. We therefore hold that the general trespasser standard of § 335 of *Restatement (Second) of Torts* applies in this case.

Section 335 provides as follows:

A possessor of land who knows, or from facts within his knowledge should know, that trespassers constantly intrude upon a limited area of the land, is subject to liability for bodily harm caused to them by an artificial condition on the land, if

(a) the condition

(i) is one which the possessor has created or maintains and

(ii) is, to his knowledge, likely to cause death or seriously [sic] bodily harm to such trespassers and

(iii) is of such a nature that he has reason to believe that such trespassers will not discover it, and

(b) the possessor has failed to exercise reasonable care to warn such trespassers of the condition and the risk involved.

■ As we said in *Sirek,* under this standard "a landowner will be liable only for failing to exercise reasonable care to warn trespassers about hidden, artificial dangers created or maintained by the landowner." 496 N.W.2d at 810. Plaintiff argues that the Reserve Pool is an artificial condition likely to cause death or serious bodily harm. The dangers were hidden, according to plaintiff, by the lack of ropes separating areas for swimmers and non-swimmers, the lack of depth markers, and the ineptitude of the lifeguards.

■ The court of appeals held that the pond was not an artificial condition because the affected terrain duplicated nature. *Johnson,* 506 N.W.2d at 637. The court of appeals further held that even if the Reserve

was an "outdoor recreation system" for purposes of the Minnesota Tort Claims Act. *Zacharias v. Minnesota Dep't of Natural Resources,* 506 N.W.2d 313 (Minn.App.1993). The court concluded that an artificially created swimming pond fell within the definition in part because "[t]o conclude otherwise would lead to the ab-

surd result that in defining the outdoor recreation system the legislature intended to include all natural and recreational state parks, but to selectively remove certain parts of the system because they were artificially created." *Id.* at 317.

Pool were an artificial condition, the county is entitled to immunity because the pool contains no hidden dangers. *Id.* We agree. As this court recognized in *Davies v. Land O'Lakes Racing Association,* 244 Minn. 248, 255, 69 N.W.2d 642, 647 (1955), even under § 339, "a possessor of land will not ordinarily be held liable for injuries occurring in ordinary, natural, or *artificial bodies of water* that are free from traps or concealments." (Emphasis added). The Reserve Pool, as constructed, has a gradually-sloped bottom with no drop-offs and contains no unusual currents. Moreover, as we noted in *Davies,* "[i]t is generally conceded that the ordinary body of water, even though it be artificial, while it does involve the risk of death or serious harm, does not constitute an unreasonable risk thereof because even a child to some extent appreciates the risks that are connected with it. See, Prosser, Torts, § 77, p. 622." *Id.*

Plaintiff argues that the county created a duty for itself by hiring lifeguards to protect swimmers. The court of appeals addressed this issue in *Zacharias. Zacharias* included claims against the lifeguards for negligent supervision and negligent performance while on duty where a child, accompanied by an adult, drowned while swimming in an artificially created swimming pond. Applying § 335 to determine whether the state and its employees were immune from liability, the court stated that lifeguarding "is part of the 'operations' of a state park containing swimming areas" and held that these employees were operating and maintaining part of the outdoor recreation system at the time of the allegedly negligent acts. 506 N.W.2d at 320.

The reasoning in *Zacharias* applies in this case. The lifeguards at the Park Reserve were "providing recreational services" as part of the "operation" of the park. Their actions, therefore, are covered by the immunity granted in Minn.Stat. § 466.03, subd. 6e. We hold that the county is immune from liability pursuant to § 466.03, subd. 6e for the wrongful death claim.[3]

The district next contends that the trial court erred in denying the district's motion for a new trial based on attorney misconduct, evidentiary errors, and excessive damages. The determination of whether or not to grant a new trial because of attorney misconduct is not governed by fixed rules, but instead rests wholly within the discretion of the trial court. *Wild v. Rarig,* 302 Minn. 419, 433, 234 N.W.2d 775, 785 (1975). The question on appeal is whether the trial court abused its discretion; the primary "consideration in determining whether to grant a new trial is prejudice." 302 Minn. at 433, 234 N.W.2d at 786.

The alleged misconduct can be divided into four parts. First, in closing argument, plaintiff's counsel stated that after an extended day program supervisor told Brandon to go find his buddy, Brandon walked out into the water and drowned. Second, even though the trial court indicated prior to trial that it would not allow testimony concerning a termination proceeding, plaintiff's counsel questioned a witness, over repeated objections, about the proceeding. Third, plaintiff's counsel misstated the law of damages to the jury by referring to the "loss of the relationship." Fourth, despite the fact that punitive damages are not permitted against school districts and counties, Minn.Stat. § 466.04, subd. 1(b) (1992), the district contends that plaintiff's counsel made irrelevant and prejudicial statements in closing argument designed to persuade the jury to award punitive damages. Plaintiff's counsel described individuals, parties, and actions as indecent, despicable, and immoral. He further stated that a supervisor and the district "lied and lied and lied" after the accident. In addition, plaintiff's counsel spoke of the value of a first son as well as the value of a son in the Christian religion and stated that if the jury awarded the damages requested, "perhaps then there will be no more Brandon Johnson's and people might start listening to jurors who hear despicable cases like this."

---

**3.** Because we hold that the county is entitled to immunity from the wrongful death claim, we need not consider whether the county's liability should have been limited pursuant to Minn.Stat. § 466.04 or whether the evidence of the county's negligence was sufficient to support plaintiff's claim.

Our review of the record reveals that plaintiff's counsel did make inappropriate and inflammatory comments. We agree with the court of appeals that counsel's conduct came close to warranting a new trial primarily because his closing argument seemed to center on encouraging the jury to punish the district and county for outrageous and reckless conduct. *See Johnson,* 506 N.W.2d at 640. The trial court judge, however, is present during the trial and is best positioned to determine whether or not an attorney's misconduct has prejudiced the jury. Here, Judge Doyscher was not only present at trial, he carefully considered the alleged misconduct. We therefore affirm the court of appeals and hold that the trial court did not abuse its discretion in denying the school district's motion for a new trial based on attorney misconduct.

The district also moved for a new trial based on certain evidentiary rulings of the trial court. Evidentiary rulings concerning "materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence" are within the trial court's sound discretion and will only be reversed when that discretion has been clearly abused. *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 725 (Minn.1983).

The first claimed error concerns the admission of termination letters sent to three of the supervisors in charge of the children at the Reserve Pool when Brandon drowned. The letters, written on school district stationary, terminated the employees on the basis of "unsatisfactory performance, neglect of duty and insubordination, including those events commencing on or about June 14, 1990 in respect to the Lake Elmo drowning." The trial court admitted the letters as admissions of a party-opponent. Minn.R.Evid. 801(d)(2). The district contends this was error because the letters were issued several months after the drowning incident and because the insubordination concerned actions occurring after June 14, 1990. The district further contends that the letters should have been excluded under Minn.R.Evid. 407, which prohibits admitting evidence of subsequent remedial measures. We hold that the trial court prop-

erly admitted the termination letters as admissions of a party opponent.

The second claimed error is the admission of evidence concerning the supervisors' conduct immediately after Brandon's body was found and the later conduct of one supervisor who lied about a doctor's appointment and hid in the bathroom to avoid speaking to the district's counsel. The trial court admitted the former evidence as relevant to the issue of negligence and the latter evidence as relevant to the witness's credibility. The trial court did not abuse its discretion by admitting evidence of the conduct of the extended day program supervisors after the drowning.

The final claimed evidentiary error is the admission of a letter written by Brandon's sister, Kristina. Kristina wrote the letter for a school project on January 27, 1992 and described her feelings when she found out about the death of her brother on the day of the drowning. The trial court admitted the letter under Minn.R.Evid. 803(3) which allows into evidence statements of "the declarant's then existing state of mind, emotion, sensation, or physical condition." The letter demonstrated the close relationship Kristina had with her brother and thus related to future economic harm. Moreover, the admission of the letter probably was less prejudicial than Kristina's testimony would have been if she had testified. The trial court did not abuse its discretion in denying the district's motion for a new trial based on improper evidentiary rulings.

Finally, the district argues that it is entitled to a new trial, or, in the alternative, remittitur, because the damage award was excessive. A new trial may be granted for excessive damages where the damages appear to have been given "under the influence of passion or prejudice." Minn.R.Civ.P. 59.01(e). The trial court's denial of a new trial motion based on excessive damages will be upheld unless there has been a clear abuse of discretion. *Young v. Hansen,* 296 Minn. 430, 435, 209 N.W.2d 392, 395 (1973). Similarly, the denial of a motion for remittitur will be overturned only if the trial court abused its discretion. *Sandt v. Hylen,* 301

Minn. 475, 476–77, 224 N.W.2d 342 (1974). "In determining whether a verdict is excessive, the trial judge must consider all the evidence, the demeanor of the parties, and the circumstances of the trial * * * * " *Id.* at 343 (citing *Jangula v. Klocek,* 284 Minn. 477, 488, 170 N.W.2d 587, 594 (1969)). We have stated that a verdict should be set aside if it "shocks the conscience." *Verhel v. Independent Sch. Dist. No. 709,* 359 N.W.2d 579, 591 (Minn.1984).

■ The trial court compared the $1,007,857.84 verdict in this case with a list of wrongful death verdicts from throughout the country, including a Michigan case where a $1,145,000 verdict for the death of a thirteen-year-old boy was held to not be excessive. *May v. City of Grosse Pointe Park,* 122 Mich.App. 295, 332 N.W.2d 411 (1982). The trial court in this case concluded that the verdict of over $1,000,000 "does not shock the conscience of this Court" and therefore denied the motion of a new trial based on excessive damages. Similarly, the trial court denied the motion for remittitur. We note, as did the court of appeals, that the jury received proper instructions, that a precise formula for calculating the loss suffered in this case does not exist, and that evidence demonstrated the close relationship Brandon had with his parents and sister. *See Johnson,* 506 N.W.2d at 640. We hold that the trial court did not abuse its discretion by denying the motion for a new trial or remittitur because the damage award was excessive even though we would have affirmed had the trial court granted the motion for remittitur.

We affirm the decision of the court of appeals.

Affirmed.