**Steven M. MAUS, Respondent,**

v.

**George J. GALIC, Appellant,**

**William Lewis, Nominal Defendant.**

**No. C2–03–195.**

Court of Appeals of Minnesota.

Sept. 16, 2003.

Brian N. Toder, Robert A. LaFleur, Chestnut & Cambronne, P.A., White Bear Lake, MN, for respondent.

Marcy S. Wallace, Minneapolis, MN, for appellant.

William Lewis, Chula Vista, CA, pro se defendant.

Considered and decided by
HALBROOKS, Presiding Judge;
TOUSSAINT, Chief Judge; and
WRIGHT, Judge.

## OPINION

TOUSSAINT, Chief Judge.

This is an appeal from a judgment dissolving a partnership. After trial with an advisory jury, the court dissolved the partnership by judicial decree as of the last day of trial and adopted the special master's report on the division of assets and award of damages. After denial of post-trial motions, this appeal followed. Because we conclude that the mutual pleadings claiming dissolution by the express will of a partner evidenced dissolution of the partnership, we reverse and remand for calculation and distribution of profits consistent with the earlier date of dissolution, but we affirm the trial court's conclusions regarding partnership accounting and the bidding process.

## FACTS

This action concerns the dissolution of the business partnership of Galic/Maus Ventures, L.L.P. (GMV), a Minnesota partnership. The partnership formed on December 6, 1985, with no definite duration, to conduct the business of inventing more efficient and sophisticated techniques of manufacturing injection-molded plastics, specifically in the areas of optical lenses and compact discs.

At the inception of the partnership, there were two equal partners, appellant George Galic and respondent Steven Maus. At the time of litigation, the two majority partners each held 48% of the equity ownership in GMV; the remaining 4% having been acquired by nominal defendant William Lewis. Galic was the managing partner, with sole authority to make binding commitments to outside parties, possible future employees, and lenders. Mutual agreement between the two partners, however, was required for any "strategic business decisions" described in their partnership agreement.

When Galic and Maus executed the GMV partnership agreement in 1985, they acknowledged that their "[c]ontributions on any given project may well not be equal . . ., both in services rendered and in monies." They agreed that appropriate records would be kept and that partner time would be valued at $40 per hour for Galic and $30 per hour for Maus. There is no record evidence that the partners were compensated for their time under this provision.

Three addenda to the partnership agreement relate to capital contributions and splitting proceeds. Except for the special cases set out in the June 1991 addendum, the parties agreed to an equal split of the net proceeds after GMV business costs were deducted. By the time of the October 21, 1991 addendum, Galic and Maus had contributed $435,124 and $18,000, respectively. Galic accepted a reduced "pay-off" due to the large accumulation of interest. All of the partnership's outstanding obligations to Galic were paid by the July 28, 1992 addendum, at which time the partners reiterated that they each owned 50% of the partnership.

A personality conflict between Lewis and Maus developed in the spring and summer of 1997. In 1997 and 1998, Maus substantially reduced the time he spent in the GMV shop in Minnesota, and while at the shop, he worked on his own personal projects.

On April 8, 1998, GMV, through its majority partners, Galic and Maus, signed an agreement to sell substantially all of GMV's assets to Optics Technology, Inc. (OTI) for $4.5 million. Of that amount, $1

million was to remain in escrow until April 8, 1999. An additional agreement for consulting and subcontracting yielded another $500,000 to the partners, and they signed noncompete agreements with OTI, for which they each received $100,000. Incorporated into these agreements was Galic's warranty that he and Maus were partners in GMV.

At about the time of the April 1998 sale, Maus purchased a home in Texas. After the sale to OTI, Galic ceased providing Maus with financial information that he had routinely provided pursuant to the partnership agreement. Galic did not resume providing the information to Maus until December 1998, two months after Maus retained an attorney. Galic also ceased making distributions to the partners and, instead, kept the funds in escrow. GMV relieved Lewis of his obligations and authorized him to provide consulting services to OTI and others.

Under the agreement with OTI, GMV remained obligated to manufacture an optic-lens machine called a "RoboCoater" at OTI's request until April 8, 2003. There was little profit left in the RoboCoater business, and by the fall of 1998, the partners considered closing that line of business for lack of work. Galic proposed a plan to manufacture RoboCoaters and proceeded with the plan even though Maus did not agree. On the two RoboCoaters manufactured without Maus's permission, Galic indemnified Maus against any potential loss, and GMV managed to retain a larger profit than that earned on prior RoboCoaters.

On March 15, 1999, about one year after the sale of assets, Maus commenced this action, alleging that his partner Galic had partnership assets and was planning a disproportionate distribution. He claimed that Galic had breached the partnership agreement by failing (1) to provide him information; (2) allow him access to the business, and (3) conduct business according to their agreement. Maus sought an accounting and an injunction from distributing assets. In an amended summons and complaint dated March 31, 1999, Maus added his claim for dissolution of the partnership due to Galic's conduct. He alleged that dissolution was caused by the express will of a partner, and he asked for an order and decree of the court dissolving the partnership.

On April 2, 1991, Galic served his answer and counterclaim to Maus' amended complaint, alleging that Maus's actions had violated his fiduciary duty to the partnership and to Galic and that Maus had wrongfully dissolved the partnership, requiring an adjustment to the distribution due the partners. As an affirmative defense, Galic alleged that he had the right to continue the business despite Maus's wrongful termination of the partnership. He also counterclaimed for breach of fiduciary duty, wrongful dissolution, and defamation. Galic alleged that "sometime after April 9, 1998, there was a significant change in the relations of the partners caused by [Maus's] expressed will, unilaterally and without any consultation with any of the GMV partners, to cease being associated in the carrying on of GMV's business."

In June 1999 Maus moved for summary judgment, requesting that the district court appoint a receiver to wind up the affairs of the partnership. In August, the court denied the motion. Maus later moved to amend the complaint to add a claim for punitive damages, which was also denied.

From August 8 to 18, 2000, the parties tried the action before the court with an advisory jury. In October, the trial court entered findings and conclusions in favor of Maus and concluded that the partner-

ship was dissolved on the last day of trial, August 18, 2000. The trial court concluded that Galic had breached the agreement by denying Maus information and access to the business and that Maus had not breached the agreement by ceasing his contributions of time and services. The court appointed a special master to hear disputes regarding the winding-up of the partnership business and to hear and decide the parties' claims regarding distribution of the partnership assets. The trial court adopted most of the jury's findings and entered its own amended findings, conclusions, and order dated November 28, 2000.

By December 2000, the parties were in mediation with the special master. After evidentiary hearings and arguments, the special master made his recommendation, including his conclusion that Maus suffered no damages from Galic's breaches and that Galic had acted in good faith in accounting and winding up the business. In the recommendation, he divided the cash among the three partners and, as agreed to by the parties, concluded that an auction would be used for the non-cash assets. The court set up the bidding process that began with Galic submitting bids for the GMV lines of business. The special master explained that it "is equitable and appropriate that Galic bid first because he improperly excluded Maus from the partnership business." Maus then could outbid Galic for any line of business, but Maus's bid must be at least 10% more than Galic's to be valid. Maus successfully bid for the lines of business. Both parties filed objections to the special master's report. On July 13, 2001, the trial court approved and adopted the special master's report and recommendation and ordered final judgment in the case.

Both parties filed motions to amend the findings. Maus argued that his bids for the business should be "reduced by 47.16728 percent representing his partnership share of those lines." The special master and the trial court rejected Maus's argument, finding that it would be "inequitable to permit Maus to obtain the lines of business at distress prices far below their true value and at Galic's expense." After a series of post-judgment motions and hearings, on December 24, 2002, the court reaffirmed its approval of the special master's decision on the auction process.

Galic filed a notice of appeal, and Maus filed a notice of review. The parties filed a stipulation regarding the funds pending appeal.

## ISSUES

I. Did the trial court err in its determination that the date of dissolution of the partnership was August 18, 2000, the last day of trial?

II. If the date of dissolution was earlier than that determined by the trial court, was appellant entitled to compensation or disproportionate post-dissolution profits?

III. Did the trial court err in its calculation regarding the capital accounting?

IV. Did the trial court err in its determination that the bidding process was properly and equitably executed?

## ANALYSIS

An action for a partnership accounting and dissolution is for equitable relief. *Maras v. Stilinovich,* 268 N.W.2d 541, 544 (Minn.1978); *see also* Minn.Stat. § 323.05 (2000) ("in any case not provided for in this chapter the rules of law and equity * * * govern").

A court of equity will mould its relief so as to determine the rights of all the

parties, and it will not allow the pleadings to prevent it from getting at the heart of the controversy and seeing that a right result is reached. *Prince v. Sonnesyn*, 222 Minn. 528, 538, 25 N.W.2d 468, 474 (1946) (quotation omitted). The trial court must exercise its powers to find the most advantageous plan that does not prejudice the rights of either party. *Maras*, 268 N.W.2d at 544.

## I.

*Dissolution Date*

### A. Partnership Agreement

■ The parties' agreement specifically addresses termination [1] of the partnership. It provides that:

> The partnership shall continue until terminated pursuant hereto or by mutual consent of the partners. If either partner leaves the partnership for any reason, whether by resignation, by repeated default (more than five times) on his obligation to contribute his share of time and money, or by ill health or death, the partnership shall terminate * * *.

The trial court concluded that the written GMV partnership agreement controlled how and when GMV could dissolve. Adopting facts found by the advisory jury, the court concluded that none of the events precipitating a termination under the partnership agreement had occurred.

The construction and effect of a contract are questions of law for the court. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). A reviewing court is not bound by, and need not give deference to, a district court's decision on a purely legal issue. *Frost–Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984).

The record reflects that by their pleadings in this action, both partners had alleged that the other's conduct had dissolved the partnership. In his amended complaint, Maus claimed that the court should dissolve the partnership due to the "express will" of any partner, citing Minn. Stat. § 323.30(2) (2000). In his answer, Galic claimed that the partnership had been dissolved by Maus's expressed will, evidenced by his conduct in partnership affairs. As the litigation progressed, the record also reflects the parties' understanding that the termination provision in their agreement allowed for either partner to terminate the partnership by leaving "for any reason." Maus even highlighted the "for any reason" language in his argument to the trial court.

Despite the parties' own interpretation of the termination provision and the allegations in their pleadings, however, the special verdict form provided the advisory jury with only three possible grounds for dissolving the partnership: (1) mutual consent of the parties; (2) Maus resigning from the partnership; or (3) Maus defaulting (more than five times) pursuant to the agreement. Similarly, the court did not enunciate whether it considered as distinct bases for termination, leaving "for any reason" or mutual consent based on the pleadings.

Based on the language of the agreement and the parties' interpretation of the agreement, we conclude that the court erred by not including, as grounds for

---

1. "Termination" and "dissolution" have distinct definitions under Minnesota's Uniform Partnership Act, which states that upon dissolution, the partnership is not "terminated" but continues until the winding up of partnership affairs is completed. Minn. Stat § 323.29 (2000). The parties did not raise this discrepancy as an issue to be addressed by the trial court. Therefore, we assume that the agreement's use of the term "termination" is synonymous with the statutory definition of "dissolution."

dissolving the partnership, leaving "for any reason" and mutual consent based on the pleadings. Because the record contains mutual pleadings claiming dissolution of the partnership by the express will of a partner, we also conclude that under the agreement, those pleadings constituted mutual consent of the partners to dissolve the partnership.

### B. Uniform Partnership Act

■ The general rule is that partners may by agreement determine their rights and duties to the partnership. Minn.Stat. § 323.17 (2000).[2] While Minnesota's Uniform Partnership Act, Minn.Stat. §§ 323.01–.47 (2000), recognizes that partners are free to reach their own agreements, the act also contains several provisions on dissolution of a partnership. The act defines dissolution as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." Minn.Stat. § 323.28 (2000). It lists causes of dissolution in section 323.30 and bases upon which a partner may ask the court to dissolve the partnership by decree in section 323.31.

Under the UPA, a partner may dissolve a partnership by his or her express will whether in violation of the agreement or not. Minn.Stat. § 323.30(1), subd. (1)(a), (d) (2000) (dissolution is caused "without violation of the agreement" by, among other actions, the express will of any partner); id., subd. (2) (dissolution is caused "[i]n contravention of the agreement * * * by the express will of any partner at any time"). The comments to the Uniform Laws Annotated explain the rationale for allowing a partner to unilaterally dissolve the partnership:

> The relation of partners is one of agency. The agency is such a personal one that equity cannot enforce it even where the agreement provides that the partnership shall continue for a definite time. The power of any partner to terminate the relation, even though in doing so he breaks a contract, should, it is submitted, be recognized.

Uniform Partnership Act § 31 cmt. (amended 1997), 6(II) U.L.A. 371 (2001); cf. Minn.Stat. § 323A.6–02(a) (2002) (providing in 1994 UPA that partner has power to dissociate at anytime rightfully or wrongfully). Accordingly, we disagree with the trial court's determination that only the parties' agreement governed the dissolution. To the contrary, the UPA provides for dissolution by the express will of a partner, whether or not there was a violation of the agreement. Id. The UPA would apply even if the expressed will of a partner dissolved an agreement prior to expiration of a specific term and a specific notice period for dissolution. See Straus v. Straus, 254 Minn. 234, 244–45, 94 N.W.2d 679, 686 (1959) (partner's institution of suit caused an immediate dissolution of partnership even though agreement expressly set term of partnership and prescribed 60–day notice period for termination of the partnership).

Termination of an at-will contract is effective when the terminating party provides "reasonable notice of the decision to terminate." Plainview Milk Prods. Co-op. v. Marron Foods, Inc., 3 F.Supp.2d 1074,

---

**2.** The Minnesota Uniform Partnership Act (UPA), Minn.Stat. §§ 323.01–.47 (2000), was repealed and replaced by the Uniform Partnership Act of 1994 (the 1994 UPA), Minn. Stat. §§ 323A.1–01–.12–03 (2002), effective January 1, 2002. 1997 Minn. Laws ch. 174, art. 12, § 69. The effective date of chapter 323A is almost two years after this action was commenced and there is no evidence that GMV elected to be governed by it. Therefore, chapter 323 is the law applicable to this action.

1078 (D.Minn.1998) (citation omitted). "[N]othing could send a clearer message of intent to terminate and provide more reasonable notice of such termination than service of a complaint seeking as relief dissolution of the partnership." *Id.* at 1079; *see also Straus,* 254 Minn. at 243, 94 N.W.2d at 685 ("it is apparent that the institution of suit * * * caused an immediate dissolution of the partnership, which would be in contravention of the partnership agreement"); *Swanson v. Lindstrom,* 151 Minn. 19, 23, 185 N.W. 950, 951 (1921) (where agreement fixed no time for continuance of operations, "bringing the action [for dissolution] was an election to terminate it").

The trial court's findings do not establish the existence of either the partner's express will to terminate or a notice of termination prior to the date the pleadings were served. About the time of the sale to OTI in April 1998, Galic warranted to OTI that Maus was his partner. The sale was executed by both partners and did not itself constitute the express will to dissolve the partnership. While a letter and meeting in September 1998 indicated that Galic was disputing Maus's right to share in the profits and continue participating in the business, there was no specific language noticing termination or dissolution of the partnership, and Galic continued to hold Maus out as his partner to third parties. *Cf. Plainview,* 3 F.Supp.2d at 1079 (noting various letters stating that agreement would terminate on specific date). The court also specifically found that Maus had neither resigned nor abandoned his position as partner of GMV.

Based on the trial court's findings, we conclude that the partnership dissolved upon service of mutual pleadings claiming dissolution by the partners. The pleadings expressed the will of both partners to dissolve the partnership. As of April 2, 1999, each party had claimed in their pleadings that the other's alleged misconduct had dissolved the partnership.

## II.

### A. Post–Dissolution Profits

■ The date of dissolution is significant to the division of profits because it sets the date before which the debts and profits attributable to the partnership must be divided between the partners. *See Schoenborn v. Schoenborn,* 402 N.W.2d 212, 215 (Minn.App.1987) (debts and profits attributable to year after de facto dissolution of partnership belonged to partner continuing the business). Both the parties' agreement and the partnership statute recognize that, upon dissolution, the partnership exists only as is necessary to wind up partnership affairs. The agreement provides that, upon termination, partners receive an equal distribution of "payments from *any existing* sales contracts or licenses of partnership projects" subject to "proceeds distribution" provisions in the agreement. Similarly, the statute provides that, subject to any agreement to the contrary, upon dissolution, a partner acts only for the partnership as "necessary to wind up partnership affairs or to complete *transactions begun but not then finished*" and that distribution is subject to payment of liabilities. Minn.Stat. § 323.32 (2000) (emphasis added); *see also* Minn.Stat. §§ 323.34, .39 (2000) (providing agency and distribution on and after dissolution).

The parties dispute whether Galic's post-dissolution services had to do with existing sales contracts or licenses. On remand, it will be necessary to divide profits after April 2, 1999, into those derived from existing sales contracts or licenses on partnership projects and those derived from new sales contracts or licenses and to

limit Maus's profits to those derived from the former.

■ The UPA distinguishes between wrongfully and not-wrongfully-dissolved partnerships with regard to winding up and allocation of partnership property on dissolution. Minn.Stat. §§ 323.36, .37 (2000). Based on the findings of the trial court and the application of equitable principles in partnership dissolutions, there is no basis for concluding that the dissolution of GMV was wrongful. The court made no findings of "wrongful" conduct by either party. It concluded that (1) Maus did not violate the partnership agreement by his conduct; (2) Galic's breaches of his contractual duty to provide Maus access to partnership information neither materially affected the partnership's ongoing business nor caused Maus damage; and (3) Galic did not breach the agreement by not paying Maus after April 1998 and that he acted in good faith in winding up the partnership. Therefore, on remand, GMV profits should be divided pursuant to the parties' agreement, using April 2, 1999 as the dissolution date.

### B. Post–Dissolution Compensation

■ The partnership agreement contains a provision on unequal "contributions" of services and monies that contemplates partners working on partnership-approved projects but contributing unequal amounts. The record reflects that the parties never used this provision while they conducted partnership business. Because the provision specifically applies to "approved" projects and because there is no specific reference to its application to winding up or post-dissolution contributions, it does not apply to the post-dissolution services for which Galic requests compensation. While compensation for post-dissolution winding up is specifically provided for in the new Uniform Partnership Act of 1994, Minn.Stat. § 323A.4–01(h) (2002), it is not available under chapter 323. See Minn.Stat. § 323.17(6) (2000) (allowing compensation only for "surviving" partner). Absent statutory authority or contract language providing for post-dissolution compensation, there is no basis for such an award.

### III.

*Capital Account*

Referee findings will not be set aside on appeal unless they are "manifestly and palpably contrary to the evidence." *Schaefer v. Bork,* 413 N.W.2d 873, 876 (Minn.App.1987) (applying this standard of review to jury determination that partnership existed), *review denied* (Minn. Dec. 22, 1987).

First, Maus seeks an explanation of the special master's basis for crediting Galic with a $48,000 contribution in 1995 and charging Maus with an extra distribution of $64,831 in 2000. Where the record is reasonably clear and the facts not seriously disputed, findings are unnecessary. *Roberson v. Roberson,* 296 Minn. 476, 478, 206 N.W.2d 347 (Minn.1973). Here, the record shows that Maus conceded that the $64,831 reduction in his capital account was for tax withholding for a nonresident partner. The trial court also adequately addressed the $48,000, characterizing it as a capital contribution based on evidence showing that it was a credit due Galic. The trial court had a sufficient basis for these findings and they were well within the court's discretion. *See Johnson v. Washington County,* 518 N.W.2d 594, 601 (Minn.1994). Under these circumstances, the findings were not contrary to the evidence.

■ Second, Maus broadly alleges that six conclusions of law are not supported by the agreement. He elaborates only on

conclusion number six. Assignment of error in a brief based on "mere assertion" and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection. *State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn.App.1997). Particularly in a case of this magnitude, such broad and vague assignments of error constitute waiver of review. It should also be noted that Maus was previously warned by the trial court to state his requests specifically and to support them with particularity in memoranda. When he failed to do so, the trial court treated the issues not raised with specificity as waived. Here, Maus waived review of the first five conclusions of law.

Third, Maus argues that it is inconsistent to conclude that profits will be split equally and that the partners are each entitled to their respective capital accounts. He argues that this is contrary to the agreement. It is clear that the parties' agreement treated capital contributions as separate items from the partnership assets for accounting. These accounts were changing as partners contributed to the partnership as needed. *See Johnson v. Johnson*, 277 N.W.2d 208, 213 (Minn.1979) (capital accounts are treated as additional, separate assets). Therefore, the trial court did not err when treating them as separate items.

■ Fourth, Using the same arguments as addressed in parts III A and III C of this opinion, Maus alleges that the only possible support for conclusion of law number six is Exhibits 1263 and 1265, which conflict with the partnership agreement and are contrary to the evidence. The two exhibits are statements of the parties' capital accounts prepared by a certified public accountant. Because record-keeping for the partnership was poor, the accountant's reconstruction was critical to resolution of the partnership dissolution. The trial court had an opportunity to assess the accountant's credibility, and Maus had an opportunity to cross-examine him. *See, e.g., Benson v. N. Gopher Enters.*, 455 N.W.2d 444, 445–46 (Minn.1990) (stating that trial judge is given wide latitude in its analysis of evidentiary rules due to its familiarity with case setting. Therefore, the court did not err in accepting the exhibits as evidence of the partners' equity.

## IV.

*Bidding Process*

The method of conducting and confirming a judicial sale is within the discretion of the court, and the policy of the law should be to sustain judicial sales where no injustice occurs. Thus, if the parties were treated fairly and the rights of appellant were not prejudiced by the terms of the sale, then the trial court should be affirmed.

*Maras*, 268 N.W.2d at 544 (citation omitted).

■ The special master devised a process "to fully and fairly divide the ongoing lines of business between Maus and Galic." On July 19, 2001, Galic's counsel submitted bids for the compact disc, RoboCoater and insert, and Fresnel GMV lines of business on Galic's behalf. Maus's counsel responded with bids saying that it was his "understanding that by making this bid my client is buying the following lines of business from Galic Maus Ventures." After Maus bid the requisite 10% above Galic's bid for all five lines of business, he requested that his bid be construed as a partnership asset, thereby reducing his price by one-half. Because he asserted that he was buying the lines of business from Galic Maus Ventures, he argued to the special master and trial court (and still maintains before this court) that "his bid price should be attrib-

uted to the partnership as a cash asset to be divided among the partners according to their established shares." This would entitle him to a return of one-half of the amount he bid.

This very issue was the subject of a two-day evidentiary hearing before the special master, who had the opportunity to consider the evidence and judge the credibility of the witnesses. The trial court confirmed the special master's recommendation that the requested reduction be denied because it would unfairly and inequitably allow Maus to acquire the lines of business for half of their value. The special master also concluded that Maus's attack on Galic's initial bid was an attempt to exploit it to his own economic advantage, thereby breaching his fiduciary duty to Galic. As author of the bidding process, the special master had a clear understanding of its terms, and the process as outlined did not refer to purchases from "GMV" or to using GMV as a conduit; it referred to "partners" as individuals bidding, receiving awards, and acquiring lines of business. Therefore, Maus's attempt to change "partner" to "partnership" by making the reference in his letter was improper and inconsistent with the process. Finally, while Maus argues that he paid too much, he concedes that valuation of the businesses was difficult and that the best estimates for some lines included broad ranges in value.

Under these circumstances, there was neither error nor unfairness in the trial court's implementation of the bidding process or its awards.

## DECISION

The trial court erroneously concluded that the Minnesota Uniform Partnership Act was inapplicable to the dissolution. Under the terms of both the partnership agreement and the act, the partnership was dissolved on April 2, 1999, by the parties' mutual pleadings for dissolution of the partnership based on the other's misconduct. The trial court properly denied respondent's requested relief as to the capital accounts and the bidding process. On remand, the trial court must apply the April 2, 1999 dissolution date to calculate and award post-dissolution profits.

**Affirmed in part, reversed in part, and remanded.**